PENNSYLVANIA WATER & POWER CO.
v. CONSOLIDATED GAS ELECTRIC
LIGHT & POWER CO. OF BALTIMORE.
Civ. No. 4179.

United States District Court
D. Maryland.
Feb. 28, 1950.

454

Piper Watkins, Avirett & Egerton, Baltimore, Md. (James Piper and R. Dorsey Watkins, of Baltimore, Md.) and Wilkie Bushby and Everett I. Willis, of New York City, for plaintiff.

Venable, Baetjer & Howard, Baltimore, Md. (Harry N. Baetjer and Norwood B. Orrick, Baltimore, Md.), and Alfred P. Ramsey and G. Kenneth Reiblich, of Baltimore, Md., for defendant.

WILLIAM C. COLEMAN, Chief Judge.

This suit is brought by the plaintiff, Pennsylvania Water & Power Company, to obtain a declaratory judgment that a certain agreement made in 1931 by the plaintiff with the defendant, Consolidated Gas Electric Light & Power Company of Baltimore, is invalid and no longer enforceable.

The defendant filed a motion for a partial summary judgment with respect to everything done by it which plaintiff alleges in its complaint to be breaches of the agreement, on the ground that all questions of breach must be submitted to arbitration pursuant to the provisions of Article X of the agreement. After full hearing on this motion, the Court granted it and consequently limited the subsequent hearing exclusively to questions relating to the validity of the agreement, as distinguished from questions of its breach.

The plaintiff company, hereinafter referred to as "Power", is a Pennsylvania corporation engaged in generating and transmitting electrical power and energy by means of (1) a generating plant (primarily hydro-electric) located on the Susquehanna River at Holtwood, Pennsylvania, near the Maryland-Pennsylvania boundary; and (2) various transmission lines running to Baltimore and Perryville, Maryland, and to York and Coatesville, Pennsylvania; also a line between a point near Ellicott City and a point near Tacoma Park, Maryland, the lines in Pennsylvania being owned by Power, and the lines in Maryland being owned by a generating subsidiary, wholly owned by Power known as Susquehanna Transmission Company of Maryland.

Apart from Power's obligation to deliver energy under the agreement, here in issue, to the defendant company, which is a Maryland corporation, hereinafter referred to as "Electric", engaged in generating, transmitting and selling electric power and energy in Baltimore and adjacent areas; and with the exception of sales which have at times been made by Power to its wholly owned generating subsidiary above mentioned and to the Baltimore Transit Company which owns and operates Baltimore's transportation system, Power has been serving only other public utilities that in turn distribute or sell to consumers. On the other hand, Electric generates and sells energy direct to the consumer, large and small, throughout Baltimore city and adjacent areas in which it has a monopoly so to do by the public utility laws of Maryland and is subject to the regulatory powers of the Maryland Public Service Commission.

Power's generating and transmission facilities are used exclusively for bulk sales of electrical power and energy to the five following public utility companies: (1) Electric, under the so-called basic agreement of June 1, 1931, here in issue, and its supplements, this agreement (Article I) expressly supplementing and in substantial respects superseding an agreement dated December 31, 1927, for a number of years prior to which Power had supplied energy to Electric, the first transmission lines from Holtwood to Baltimore having been built as early as 1910; (2) Metropolitan Edison Company of Pennsylvania, under a contract dated November 15, 1945, which supplanted earlier contracts with Metropolitan Edison (or its predecessor affiliate, Edison Light & Power Company); (3) Philadelphia Electric Company, owner of the hydro-electric plant on the Susquehanna River at Conowingo, Maryland, under a contract dated August 1, 1933, and supplements, which supplanted an earlier agreement between Power and a predecessor company of Philadelphia Electric; (4) Pennsylvania Water & Light Company, under a contract dated May 1, 1933, and supplements which supplanted an earlier contract between

Power and a predecessor company; and (5) the Pennsylvania Railroad Company, under a still existing contract made in 1931 to which Electric is also a party. Electric consented to the execution by the plaintiff of all of these contracts with the utility companies just named which were entered into subsequently to the basic agreement between Power and Electric here in suit.

This basic agreement which bears date of June 1, 1931, is by its terms (Article I) to run for forty-nine years, that is, until April 22, 1980, or for a little more than thirty years from the present time. Power's annual report to its stockholders for the year 1931 gives a very concise description of the purposes and effect of the agreement as follows: "A supplemental power agreement, dated June 1, 1931, for a period of forty-eight years, was also made between your Company and the Consolidated Company, under which the Consolidated Company has purchased the entire supply of power and energy available to your Company not otherwise disposed of under existing contracts, the payments again being based on annual sums, rather than upon amount of output. The proceeds received from sales to other customers will be credited on the annual payments which the Consolidated Company is required to make to your Company."

"The new contractual arrangement with the Consolidated Company covers a period of forty-eight years and constitutes virtually a guarantee of earnings on your Company's capital stock, since all the payments which the Consolidated Company is obligated to make to your Company are an operating expense of that company and thus come ahead of the dividends on its own preferred and common stock."

The underlying reason for the parties making this agreement is more specifically set forth in the preamble recitals in the agreement itself, as follows: "Whereas an agreement has been made between Power and Electric dated December 31, 1927, and terminating December 31, 1970, providing among other things that the investment programs of said companies for additional generating and transmission facilities shall be co-ordinated well in advance, to the greatest benefit to the parties and to the public served by them; and

"Whereas in accordance with this intent of said agreement, Power and Electric have made an agreement of even date herewith, terminating April 22, 1980, with Safe Harbor Water Power Corporation, a corporation of the State of Pennsylvania, hereinafter called Safe Harbor, for the transmission and purchase of electrical power and energy, by Power one-third, and by Electric two-thirds, of the electrical output of the initial development of a hydroelectric project of Safe Harbor, known as the Safe Harbor Development, whereby the operation of the hydroelectric and steam-electric generating plants of Power at Holtwood, Pennsylvania, and of the Safe Harbor Development, will be so co-ordinated that the greatest possible combined amount of power and energy will be derived therefrom; and

"Whereas determination of the relative pecuniary rights and obligations of Electric and Power under said two agreements is difficult and expensive, and likely to become increasingly so, and is not conducive to the most effective utilization of output, and coordination in operation, of the two plants; and more complete co-ordination can be attained and greater economies effected by the sale to Electric of all of Power's electrical power and energy (including that to be purchased from Safe Harbor) available for such sale, and by payment therefor on the basis of an annual charge, (instead of unit rates for power and energy), which together with payments from other customers is expected to yield to Power approximately the same net power revenue now received by Power from all its customers, including Electric, plus a reasonable income on any additional investments hereafter made by Power to serve any customers."

In order that the agreement may be fully presented and understood at the outset of this opinion, we give the following summary of the contents of each of its ten Articles:

Article I provides that the agreement is to supplement the agreement of December 31, 1927 between the parties, and to re-affirm all consistent provisions thereof, and

then prescribes the forty-nine year term, which we have heretofore explained.

Article II provides for the purchase by Electric of all of Power's electrical capacity and energy not otherwise disposed of by Power in the performance of (1) Power's then existing contracts (namely, those with its Pennsylvania customers); (2) new contracts entered into by Power with Electric's approval; and (3) "any duty or obligation to serve imposed on Power by its charter or otherwise by law."

Article III provides that subject to the orders of "any regulatory authorities in the exercise of their respective powers and jurisdiction under the laws of Pennsylvania, Maryland, and/or the United States to fix reasonable rates," and subject to increase or decrease "by agreement of the parties subject to the regulatory powers of such authorities", Electric shall màke annual payments to Power consisting of: (1) a large fixed sum, computed and fixed as set forth in this Article to be approximately $2,832,259.75 as of the year 1930, subject, however, to reduction for certain years, according to a formula set forth in Article III as modified by the supplemental agreement of September 29, 1939; (2) also a sum equal to a substantial percentage (as much as 19.30% after 1938) of the cost of net additions made by Power and its subsidiaries to plant and related facilities as modified by the supplemental agreement of September 29, 1939; (3) also an amount equal to all of Power's reasonable operating expenses accrued during the calendar year, including maintenance and general expenses, insurance and taxes, and a reasonable allowance for renewals and replacements, including provision for depreciation of property other than net additions, in the operation of generating plants, interconnected transmission systems and all facilities appurtenant thereto; and (4) also the cost to Power of power and energy purchased by it from Safe Harbor Water Power Corporation and from other sellers with the approval of Electric. From the aforesaid total sums, Article III provides that there shall be deducted the following: (1) amounts accrued during the given calendar year to Power from sales to customers other than Electric of power and energy; (2) a reasonable credit on account of increase in Power's depreciation reserve since December 31, 1930; and (3) the sum of $600,000, this deduction being provided for in the supplemental agreement of September 29, 1939, effective December 1, 1939, because the Public Service Commission of Maryland had directed that Electric's rates to its consumers be reduced, and that a substantial portion of such reduction be provided for through a decrease in Electric's payments to Power.

Article IV provides in full as follows: "So far as possible consistently with the performance of any duty or obligation to serve imposed on Power by its charter or otherwise by law, Power shall obtain the approval of Electric before entering into any agreement or agreements with any other person or corporation for the sale and/or purchase and/or interchange of electrical or hydraulic power and energy, or before making any substantial modifications in the existing contracts now in force between Power and its customers other than Electric."

Article V requires (1) Electric's prior approval to be obtained by Power of any single addition to the latter's plant, transmission lines or other facilities costing in excess of $50,000.00 on the basis of which Electric is required to make the payments required under Article III; and (2) Electric's prior approval before disposition by Power in any one year of its property, plant or equipment having a total value in excess of $50,000.00.

Article VI provides that Power at all times, so far as practicable, shall keep its equipment in first class condition in accordance with good engineering practice, and shall arrange whenever possible to have all of its maintenance work done in the low flow periods.

Article VII suspends the obligations of the parties to supply and to take, respectively, power and energy as specified in the agreement, by reason of the intervention of war or other major catastrophe beyond the control of either party.

Article VIII provides that "It is the intent of this long term agreement to encourage the maximum cooperative utilization of the power and energy entitlements and resources and other facilities of the parties hereto to the end that the joint use of their property and equipment shall give the greatest practical benefit to the public, and that all duplication of investment, and all unnecessary operating and maintenance costs, shall be avoided except such as would contribute towards the maintenance and improvement of the high standard of service rendered. The parties hereto shall cooperate to the fullest extent in the selection of the most suitable equipment, in the coordination of their investment programs for additional generating capacity, transmission and tie-in facilities, etc., and shall so conduct their operations that economic interchange of power and energy during the different hours of the day, the seasons of the year, and over more prolonged periods, shall be encouraged in every possible way. For this purpose and to insure that the costs of operation and maintenance, and other current costs, of Power's facilities for the generation and transmission of electrical power and energy, shall be at all times the minimum that is practical in view of the high standard of service rendered", Article VIII then sets up a so-called Operating Committee, consisting of one representative appointed by each party who shall act as his party's "agent for investigation, consultation and advice in all operating, engineering and accounting matters pertaining to the interconnected facilities herein contemplated, and to the supply and interchange of power and energy herein provided for." It is provided that either party may at any time change its representative or withhold from him authority to act; that members of the Operating Committee "shall confer upon request of either" and that in case of their inability to agree, the question in dispute shall be submitted to the Presidents of the respective companies for their decision.

Article IX affords to Electric complete access to and authority to audit the accounts of Power at any time for the pur-

pose of determining payments to be made by Electric to Power under Article III.

Article X contains the provisions for arbitration. It sets up a Board of Arbitration consisting of three members, one to be chosen by each party and the third to be chosen by the other two. It provides that, should the parties be unable to agree upon the full composition of the Board's membership, it shall be filled by selection of the then Chief Judge of the Supreme Bench of Baltimore City, or in the event of his disinclination or failure to act in thirty days, by the then Chairman of the Public Service Commission of Maryland. The Article contains other customary provisions for prompt prosecution of the Board's duties; defraying the expenses of arbitration, etc.

A copy of the agreement was duly filed by Electric with the Maryland Public Service Commission, and also by Power with the Pennsylvania Public Utility Commission and the Federal Power Commission.

### The Issues.

Power contends that the basic agreement is invalid and henceforth completely unenforceable for the following seven reasons: (1) It violates Section 1 of the Sherman Act, 15 U.S.C.A. § 1, which provides that "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is hereby declared to be illegal". (2) It violates Section 3 of the Clayton Act, 15 U.S.C.A. § 14, which provides that "It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machinery, supplies, or other commodities, * * * or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or un-

derstanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce." (3) It violates Section 5 of the Federal Trade Commission Act, 15 U.S.C.A. § 45, which provides that "Unfair methods of competition in commerce, and unfair or deceptive acts or practices * * * are hereby declared unlawful." (4) It violates Section 10(h) of the Federal Power Act, 16 U.S.C.A. § 803(h), which provides that "Combinations, agreements, arrangements, or understandings, express or implied, to limit the output of electrical energy, to restrain trade, or to fix, maintain, or increase prices for electrical energy or service are hereby prohibited." (5) It is contrary to the public policy of the Federal Government and of both Maryland and Pennsylvania with respect to restraints on trade and commerce. (6) It lacks the legally requisite approval of the Public Utility Commission of Pennsylvania. (7) It is ultra vires because, in executing it, Power's directors acted without the authority of Power's stockholders and beyond the authority of corporate directors under Pennsylvania law.

Both the Maryland Public Service Commission and the Public Utilities Commission of Pennsylvania were permitted to intervene. Counsel for the former supports Electric's contention that the basic agreement is valid and subsisting. The latter Commission's counsel, however, contend that the basic agreement is invalid because (1) never formally approved by the Pennsylvania Commission, and (2) it is an illegal attempt to deprive that Commission of the rights and duties delegated to it by Pennsylvania law.

Electric defends the validity of the basic agreement by denying that it violates any Federal or State statute or is contrary to any Federal or State public policy. Electric further contends that the basic agreement was approved by plaintiff's stockholders; that it is not ultra vires; that it did not require the approval of the Public Utility Commission of Pennsylvania; that it is not an illegal attempt to deprive that Commission of its jurisdiction and powers, and lastly, that Power is estopped at this time, after accepting the terms and condi-

tions of the basic agreement for 17 years and operating thereunder, from attacking it on the ground of ultra vires and lack of stockholders' and Commission's approval; and that, similarly, by the doctrine of laches, the Pennsylvania Commission is estopped from asserting the agreement's invalidity.

### Estoppel.

We will first consider the defense of estoppel as directed against Power because if, as Electric contends, Power is foreclosed from attacking the validity of the basic agreement on all grounds since Power's officers executed it voluntarily, with full authority to do so, and since Power for 17 years voluntarily acquiesced in and operated under the provisions of the agreement, this becomes a complete defense and consideration of other questions becomes unnecessary. We will, however, defer consideration of the defense of estoppel as directed against the Public Utility Commission of Pennsylvania, intervenor, until we deal with the question whether that Commission's approval of the basic agreement was requisite to its validity.

A proper approach to this question of estoppel requires an understanding of the circumstances surrounding the relations existing between Power and Electric prior to, as well as at the time and since the basic agreement was entered into.

The basic agreement represented a combination and extension of less formal arrangements which had existed between Electric and Power since the latter's organization in 1910, when John E. Aldred organized Power and became president of it as well as of Electric. He and his associates acquired control of Electric as well as of Power in 1910 and both companies continued under his direction and control from that time until he resigned in December, 1938. During this period Power supplied electrical services to Electric harmoniously under various contractual arrangements which continued until 1931 in accordance with the policies that had been formulated by Mr. Aldred, with increasingly close managerial association and co-

operation between the two companies. Likewise, when the basic agreement was entered into as of June 1, 1931, and until 1946, the managements of the two companies cooperated in the coordination of their respective operations and facilities under this agreement. They arrived at joint decisions on matters affecting both companies, and on differences arising between them, through the Operating Committee set up by Article VIII of this agreement. Aldred was a director and chairman of the boards of both companies. Charles E. F. Clark was a director and vice president of Electric and also a director and president of Power. John A. Walls was a director of Electric and also a director and vice president of Power. C. M. Cohn was a director and executive vice president of Electric and also a director of Power. Following Aldred's resignation from the control of both companies and until about 1940, several of his close associates continued as directors of both. The following year Electric sold all of its remaining 20,675 shares of its earlier holdings (totaling 63,000 shares) of Power's stock. The policies of managerial cooperation developed by Aldred continued as long as Electric's management included Messrs. Wagner and Cohn who had participated in the formulation of the policies of Electric while Aldred had been in control. However, in 1943, Wagner, who was then chairman of the board of Electric, retired, and in 1946 Cohn likewise resigned as Electric's president and relinquished active direction of the latter's affairs, although he continued to hold the position of chairman of its board until his death in 1946.

At about this time the contractual relations between the two companies became the subject of discussion and Electric urged the abrogation of the basic agreement on the ground that this would be in the best interests of both companies. In substitution, Electric advocated a capacity and energy type of contractual arrangement. It was represented by Electric that it could, through action of the Maryland Public Service Commission, have the basic agreement terminated. However, later in 1946 Electric concluded that further discussions with respect to the abrogation of the basic agreement would not be fruitful and announced that it preferred no change in that agreement. At about the same time Electric withheld payments to Power under the agreement, due to disputes as to amounts due. The sums so withheld at the time the present suit was instituted in the fall of 1948 had increased to an amount in excess of $800,000. Electric's right to continue to withhold these payments is one of the major questions in dispute.

Continued disagreements between the two companies came to a head in 1948 when Electric refused to approve Power's proposed new plant expansion at Holtwood, Pennsylvania, and instead, extended its own plant facilities in Baltimore. Power contended that the Holtwood location, using coal dredged from the Susquehanna, would produce energy more cheaply than it could be produced at the new plant in Baltimore, in spite of greater initial capital expenditure required at Holtwood. Later in 1948, Power formally notified Electric that it considered the basic agreement invalid and unenforceable for the same reasons that it asserts in the present suit, and followed this notice with filing suit on September 28, 1948.

It will thus appear from the summary of the development of the interrelations of the two companies from 1910 through 1948, that until 1946 everything went smoothly under the so-called joint Aldred control, but in that year, when that control ceased and new executives assumed control of Electric and exerted more fully the power and authority which had been vested in them by the basic agreement, Power resented and resisted such exercise of power and authority. So, a rather extraordinary situation is presented. We have two very large public utility companies serving extensive areas, in which there are many large and important industries and many thousands of people, with large, steady growth in both population and business development. Both companies have extremely large investments in plants and equipment and have served

the public efficiently and well pursuant to the provisions óf the basic agreement for fifteen years since it became effective in 1931 with no friction, and with the approval of the State regulatory bodies under whose supervision and control they have been placed by law. In spite of this situation, the Court is now told by Power that the basic agreement was never valid, that it should never have been executed; that the two companies operated in harmony under it for fifteen years only because Power was treated as a mere agency of Electric through the so called joint Aldred control that existed throughout this period; that there was nobody to complain about the oppressive, one-sided character of the provisions of the basic agreement until that control was superseded in 1946 and the veil was drawn from across the true meaning and effect of that agreement, and that then for the first time it was brought home to Power and its executives and directors that Power had been mislead into an unlawful agreement and one which must be abrogated if Power is to enjoy the benefits to which it is entitled under the law, as a public utility corporation with large potential purchasers of its electric energy, and with great opportunities to extend its plants and facilities into new areas.

■ In the face of these facts, prima facie the situation appears to be that of a party seeking the aid of a court because it has found that its expectations over the years have not been realized with respect to its undertakings voluntarily and deliberately entered into. Ordinarily, the law turns a deaf ear to a party seeking relief under such circumstances. As was said in Pittsburgh, I., E. & E. R. Co. v. Altoona & B. C. R. Co., 196 Pa. 452, at page 467, 46 A. 431, 432, "equity will turn a deaf ear for relief from a contract intelligently and deliberately made, when prayed for by a party to it, whose conscience has become quickened only when hopes are disappointed and expectations not realized. If we are asked to give equitable relief to extended hands, they must not only be clean, but unfettered by a contract of their own making." In other words, the law will not come to the aid of those who have merely made a bad bargain. However, in the present case Power claims that this is not such a situation as that to which the aforegoing firmly established principle of law applies. Power asserts that the basic agreement is ultra vires,— an agreement which the officers and directors of neither Power nor Electric had the legal right to enter into and because not approved by its stockholders, and also because by its terms and effect it violates both Federal and State laws and is contrary to public policy, both Federal and State.

■ In view of these extraordinary, sweeping allegations, and of the great amount of testimony and argument which has been presented by Power in an effort to support them, this Court will not dismiss Power's complaint merely by applying the principle just referred to without carefully analyzing the facts and the applicable law, since it is well settled that while a corporation, when acting within the general scope of its powers, as well as those contracting with it, may be estopped to deny that it has complied with the legal requirements surrounding its acts, nevertheless, when what the corporation has done is beyond the powers which the law has given it, neither it nor those contracting with it are estopped by what has been done from showing that those acts are contrary to law. Central Transportation Co. v. Pullman Palace Car Co., 139 U.S. 24, 11 S.Ct. 478, 35 L.Ed. 55; Sherman & Ellis v. Indiana Mutual Casualty Co., 7 Cir., 41 F.2d 588.

As already indicated, Power's grounds of attack upon the basic agreement here in issue fall into two major groups: (1) alleged violations of Federal laws; and (2) alleged violations of State laws. Accordingly, we will first consider the alleged violations of the first group.

### Federal Laws against Monopolies and Restraint of Trade.

The Federal laws of which the basic agreement is alleged to be in violation, which we have previously enumerated, explaining the particular sections thereof al-

462

leged to be violated, are: (1) the Sherman Act; (2) the Clayton Act; (3) the Federal Trade Commission Act, and (4) the Federal Power Act. The first three of these statutes come under the broad classification of Laws against Monopolies and Restraint of Trade, and the fourth, the Federal Power Act, may also be so treated, since Section 10(h) of that Act, the restraint of trade section, is the one which Power alleges is violated by the basic agreement.

It is necessary first to analyze the language and effects of those parts of the basic agreement which Power asserts are in violation of the heretofore specified provisions of Federal laws; next to analyze the meaning and effect of those provisions as applied to the parts of the basic agreement which Power would have us condemn, and then determine whether there is any merit in any of Power's contentions.

The parts of the basic agreement which Power would have us condemn are Articles II, III, IV and V. Article II gives to Electric the right, throughout the life of the agreement, to have all the electric energy that Power produces less such as is covered by contracts to supply others, existing when the agreement was entered into; and less, also, such electric energy as may be required under new contracts entered into with third parties with Electric's approval.

Article III prescribes, for the life of the agreement, the amounts which Electric shall pay Power for the electrical energy it receives from Power.

Article IV reinforces Article III in that it forbids Power without Electric's prior approval (1) to enter into any agreement with any third party for the sale, purchase or interchange of either electric or hydraulic power or energy; or (2) to make any substantial modifications in existing contracts between Power and its other customers.

Article V forbids Power without prior approval of Electric (1) to make any single investment in plant or equipment in excess of $50,000, on the basis of which Electric is obligated to make the annual payments to Power pursuant to Article III; and (2) to dispose in any way, in any one year, of any part of its plant or equipment of a value in excess of $50,000.

It will thus be seen that, in summary, these four Articles of the agreement do the following things: (1) control the prices at which Power may dispose of its energy to other customers, through control of all future contracts that Power may make; (2) control plant expansion, and thereby control output by Power; (3) control territory and thereby control what new customers, if any, Power may have, and (4) require that Power take its so called "backfeed" energy only from Electric, that is to say, supplemental energy which Power at times needs in order to fully supply the requirements under its outstanding contracts with third parties and which Power's installed capacity at the time may not be sufficient to meet.

Power maintains that the first three of the above results under the agreement are, by the very terms of the four Articles of the agreement which we have just analyzed and which create these results, in direct violation of the express provisions of (1) Section 1 of the Sherman Act which declares illegal all contracts involving interstate commerce that restrain trade; (2) Section 5 of the Federal Trade Commission Act which outlaws unfair methods and practices of competition in interstate commerce; and (3) Section 10(h) of the Federal Power Act which prohibits all agreements that expressly or impliedly limit the output of or restrain interstate trade in electrical energy. As respects the fourth result, i. e., that Power shall buy only from as well as only sell to Electric, unless Electric desires otherwise, Power maintains that this is in violation of Section 3 of the Clayton Act, which makes unlawful all interstate agreements which control from whom one shall buy if the effect thereby is to substantially lessen competition or tend to create a monopoly.

Power contends that the basic agreement is not a contract for the sale of its entire output of energy to Electric, since Article II provides that Electric shall receive only such power as is "not otherwise disposed of in performance of [Power's] now existing contracts," or "new contracts entered into

by Power with Electric's approval." From this it is contended by Power that Electric is solely a residual receiver of such of Power's energy as remains after Power has supplied its other customers with what they are entitled to under Power's existing contracts with them. Power points out that at the time the basic agreement was made, approximately 40% of its energy was being sold by it under existing contracts to customers other than Electric; that at the present time Electric's average annual payments to Power amount to less than 12% of Power's total operating revenue from power sales in 1948, and that there has always been a substantial amount of Power's energy which has been sold to customers other than Electric, namely, the three electric utilities heretofore referred to, and the Pennsylvania Railroad.

Power further contends that even if the agreement were one for disposition of its entire output to Electric, it likewise then would be illegal because of its purpose and effect to preclude competition through price fixing and limiting Power's territory and output,—things which are expressly prohibited by the Sections of the Sherman Act, the Clayton Act, the Federal Trade Commission Act and the Federal Power Act, which we have heretofore analyzed. Power maintains that the basic agreement is not like those contracts between manufacturers and jobbers or distributors who are doing business at different non-competitive levels pursuant to which the jobber or distributor buys the entire output of the manufacturer; but that here, Power and Electric were, and but for the basic agreement would still be in competition with each other in the generation, transmission and sale of power, both at wholesale and retail levels. Power stresses the fact that under Article V of the basic agreement Electric has an absolute veto over the acquisition, construction and installation by Power of facilities costing over $50,000 and that Electric can, therefore, limit the output by Power by precluding its expansion, which Electric has, in fact, done in several instances. Also, Power claims that under Article V Electric may forbid, and has, in fact, forbidden installation of additional facilities and the increase of output by Power, despite the fact that such additional facilities and output are needed by the public and that it would be more economical for such additions to be made by Power than by Electric. Power points out further that Electric has taken the position that under the control provisions of Article V, Electric may prevent installations by Power even though no return is required under the basic agreement to be paid to Power with respect to such installations.

Power relies upon such decisions as United States v. Reading Co., 226 U.S 324, 33 S.Ct. 90, 57 L.Ed. 243; Id., 228 U.S. 158, 33 S.Ct. 509, 57 L.Ed. 779; United States v. E. I. DuPont DeNemours & Co., C.C., 188 F. 127; United States Tel. Co. v. Central Union Tel. Co., 6 Cir., 202 F. 66, certiorari denied 229 U.S. 620, 33 S.Ct. 1049, 57 L.Ed. 1354; American & British Mfg. Corp. v. New Idria Quicksilver Mining Co., 1 Cir., 293 F. 509; Norfolk Southern Bus Corp. v. Virginia Dare Transportation Co. Inc., 4 Cir., 159 F.2d 306. Let us analyze these cases.

In United States v. Reading Co., the Supreme Court held that a series of contracts, all identical, between interstate carriers and a great majority of the independent coal operators, to market all the coal of the latter for all time, at an agreed percentage of tidewater price, were all parts of a concerted scheme to control the sale of the independent operator's output, and therefore were unreasonable and in restraint of interstate trade within the prohibition of the Sherman Act.

In United States v. E. I. duPont de Nemours Co., the duPont Company had for a long while been the most influential member of a gun powder trade association, through which a policy was adopted of acquiring the assets of other corporations and vesting ownership of their plants and control of their business in the duPont Company. As a result, within five years duPont had acquired the stock of, and had caused to be dissolved 64 corporations engaged in the manufacture of powder and other explosives, and controlled between 64% and 100% of the trade throughout the

entire United States in the different kinds of explosives sold, as well as directly or through subsidiary corporations controlled all of the other members of the trade associations, which, upon the duPont virtual monopoly being thus established, was thereupon dissolved. The Supreme Court held that this constituted a combination in restraint of interstate commerce in violation of the Sherman Act, it being merely the continuance in a different form of the old illegal association.

In United States Telephone Co. v. Central Union Telephone Company it was held that a contract between a local telephone company and a long distance company for a connection between their lines, and the use of the local lines for sending and receiving long distance messages, which forbid the local company to permit any similar connection by any other long distance company for a term of 99 years, thereby disabling it from giving its subscribers the benefit of competition in long distance service and from extending its own service as authorized by its charter, was invalid as tending to create a monopoly prohibited by the Sherman Act.

In American & British Manufacturing Corp. v. New Idria Quicksilver Mining Co., the plaintiff corporation, which produced one-third of the entire quicksilver production in the United States, made one of its stockholders and directors its agent for final approval of a contract with defendant company for the sale, at an enhanced price, of all the quicksilver it had on hand, as well as all it might produce in a given year. The defendant company had formed a scheme to corner the market for that year by contracting for practically the entire production in the United States, and plaintiff's agent was a party to this scheme. This, the Court held, an illegal combination in restraint of trade in violation of the Sherman Act.

In Norfolk Southern Bus Co. v. Virginia Dare Transportation Co., an agreement between interstate motor carriers, whereby one carrier was to operate only two days a week instead of six as it had previously done and was to receive one-third and the other carrier two-thirds of the net business, was held to be in restraint of trade in violation of the Sherman Act. The Court also held that, irrespective of the provisions of the Sherman Act, this pooling agreement violated the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., since the Interstate Commerce Commission's approval had not been obtained thereto.

Prima facie, without having first analyzed and fully understood (1) the relation of Power and Electric to the territory and the public that each served; (2) their relations to each other, and (3) their status before the State regulatory commissions that controlled them at the time the basic agreement was entered into and during the seventeen succeeding years that Power and Electric operated under it, prior to the filing of the present suit, it might appear that the facts in the aforegoing cases are not sufficiently distinguishable from the facts before us to permit of a distinction in the application of legal principles. However, no two cases are precisely alike, and when the facts before us are analyzed and fully understood we are satisfied the holding in those cases is not decisive of the present case.

Irrespective of what they may have been prior to the year 1931 when they entered into the basic agreement, Power and Electric have not, it is true, since then been competitors as that term is both commonly and legalistically understood. But we do not find anything in the Sherman Act, the Clayton Act, the Federal Trade Commission Act or the Federal Power Act, as these several statutes have been interpreted and applied by the Supreme Court, that says that Power and Electric must nevertheless be converted now into competitors even though in 1931 they (1) formally and voluntarily agreed that they did not want to be competitors; (2) they have not since been competitors and (3) the services which they have rendered to the public in their respective territories since 1931 have met the requirements imposed upon them by the regulatory bodies to which they have been, and still continue to be answerable by law.

Electric produces,—generates—and also buys electrical energy, but what it both

produces and buys it mainly sells, as a *retailer,* direct to its *consumer* public. On the other hand, while Power likewise both generates and buys electrical energy, it, unlike Electric, is a *wholesaler,*—it sells to retailers including Electric, which in turn sell to the consumer. As such retailer, Electric enjoys, in certain territory in Maryland, a legal monopoly under the protection and regulation of the Public Service Commission of Maryland. Power cannot compete with Electric in the latter's territory unless it obtains authority so to do from the Maryland Commission. There would be no ground for granting such authority unless Electric should fail to perform its obligations as defined by the public utility laws of Maryland and enforced by the Maryland Commission; or unless the Maryland Commission should find that change in public needs requires it. Conversely, the same is true with respect to Electric's rights in Pennsylvania in relation to Power's legal protection and regulation there, under Pennsylvania public utility laws as administered by the Pennsylvania Public Utility Commission.

Subject to the specific limitations stated in the basic agreement, Electric has agreed to buy from Power and Power has agreed to sell to Electric all the energy that Power produces. As part of this purchase, Electric says, in effect, to Power, "You, therefore, cannot sell to others what you are obligated to deliver to us and for which we are obligated to pay you, unless we consent." And here it is important not to overlook the fact that Power, as we have pointed out, has no legal obligation to the *consumer* public in Pennsylvania except through its legal obligations as a wholesaler to supply energy to the retailer who in turn sells it to the consumer. In other words, it is the retailer,—the one to whom Power has contracted to sell energy in Pennsylvania,—just as in Maryland it is Electric, the retailer, to whom Power has agreed to supply energy in Maryland, that is directly obligated to the consumer public to meet its needs,—to supply electrical service,—entirely independently of what may be the relationship between retailer and wholesaler. The service to the public

must first be shown to be actually impaired by such latter relationship before there is any requirement to change it, and such proof, if it exists, is a matter for submission to the State regulatory bodies,—the utility commissions,—for their action. They are the authority to make any change if and when found to be necessary. The testimony in the present case is totally devoid of any proof that the consumer public in either Maryland or Pennsylvania is not receiving adequate service, or that either the Maryland or the Pennsylvania Commission really believes that the existing relationship between Electric and Power under the basic agreement has been or is likely to be detrimental to that service.

The situation in 1931 when the basic agreement was entered into was this, as respects the question of monopoly on Electric's part: Electric alone was supplying a substantial, but not quite as large an area as it now supplies. The Philadelphia Electric Company, to the northeast, was alone supplying a very much larger area then Electric. To the west of that was the Pennsylvania Power & Light Company, which was the exclusive utility of its kind in that area. Further to the west was the Metropolitan Edison Company which, likewise, alone served its area. Still further to the west and south was the area served only by the Potomac Edison Company, and further to the south, that served only by the Potomac Electric Power Company. In other words, all of these companies were operating as regulated monopolies within their particular territories.

The situation as respects these companies is the same now as it was in 1931, as respects competition. That is to say, Electric and the Philadelphia Electric Company cannot compete with each other unless and until the regulatory authority gives its consent upon finding that the utility which occupies a given territory is not supplying the public with adequate service, or that it is charging excessive rates. Electric has no charter or franchise rights authorizing it to sell energy to the public in Pennsylvania. Similarly, none of the Pennsylvania Companies just referred to have any right to come into Maryland and compete with

Electric. Power's position in Pennsylvania is that of a wholesale generating company situated in the midst of this group of local distributing companies. Power itself has never been a retail distributing company. It cannot enter into competition with the Pennsylvania retail distributing companies unless the Pennsylvania Public Utility Commission determines that they are not fulfilling their public obligation. Similarly, Power may not come into Maryland and compete with Electric unless the Public Service Commission of Maryland determines that Electric is not properly discharging its public obligation.

Thus it is essential, in analyzing the position of Power and Electric in relation to each other and to the public in the areas they serve or may want to serve, to bear in mind that they represent monopolies regulated by law. Price fixing is inherent in, and certainly within very broad limits, controlled by private monopolies, but in public monopolies, prices are controlled by law. So, limiting production and preventing competition are questions which take on a different aspect in dealing with public utilities as contrasted with private enterprises. Furthermore, as counsel for Electric point out, in the latter, limiting production and cutting down competition have relation to inventories that can be built up, but this is not true with respect to electric energy, to kilowatts. This energy must be used as fast as it is made. Kilowatts cannot be stored. So, distributing companies must be in a position to meet the immediate demand. It is impossible to create an artificial scarcity or surplus. Economical and efficient operation of distributing companies simply means that they should have such capacity as will take care of a given load as it may exist, at a given time, with a reasonable margin of safety. To do more would amount to waste. It is such economy and efficiency conducive to the most effective utilization of output and coordination in operation of the plants at Safe Harbor and at Holtwood, Pennsylvania, that the basic agreement in its preamble seeks to produce. Here it should be noted again that if Power could buy energy more cheaply from another company than Electric could supply it, this would make no difference to Power under the basic agreement because Electric pays the bill in either event.

The Sherman and Clayton Acts.

■ For the aforegoing reasons, we agree with counsel for Electric that in this fundamental distinction between private and public monopolies lies a basic distinction between the facts before us and those presented in such cases as Norfolk Southern Bus Corporation v. Virginia Dare Transportation Co., supra, stressed by counsel for Power. There it was not merely a question of cutting down competition, but the transportation *service* afforded the shipping public, as well as the *rates* charged for such service were directly affected thereby. Similar situations were involved in United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129; Appalachian Coals Inc. v. United States, 288 U.S. 344, 53 S.Ct. 471, 77 L.Ed. 825, and United States v. Eastern States Retail Lumber Dealers' Association, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed 1490, L.R.A.1915A, 788. In the present case there is a total absence of any showing of detriment to the public as respects either rates or service. On the contrary, the results of the basic agreement have been beneficial to the public so far as appears.

Standard Oil Company of California and Standard Stations v. United States, 337 U.S. 293, 69 S.Ct. 1051, is another recent example of the distinction. In that case, under contracts entered into by Standard Oil Company of California with independent dealers in petroleum products and automobile accessories, each dealer agreed to purchase exclusively from Standard all of his requirements of one or more of the products marketed by that company. In 1947 these contracts represented a gross business of $58,000,000, comprising 6.7% of the total in a seven State area in which the Standard sold its products. It was held that these contracts violated Section 3 of the Clayton Act and, accordingly, Standard was enjoined from enforcing or

entering into them. Thus, it was the restriction preventing the distributor from buying from competitors, even though he could have done so more cheaply than from Standard, that was the crux of this case. That suit was brought by the Government for the benefit of the public in order to prevent a monopoly. The present suit is not brought by the Government, Federal or State. Nor is there any showing that the public ever has been, or is likely to be hurt by the basic agreement. The fact that Power could buy from another company more cheaply than Electric could supply it, would make no pecuniary difference to Power because Electric in either case pays the cost. Nevertheless, Power asserts that since it has outstanding contracts both with Electric and with its various Pennsylvania customers; and since its generating capacity is not sufficient to permit it, at all times of the day and night and at all seasons of the year, to supply the total requirements under such contracts, it is an unreasonable restraint such as is forbidden by Section 3 of the Clayton Act to require that any such deficit must be supplied exclusively by Electric, and not from other sources, namely, by Power's installation of additional generating capacity or by Power purchasing from one or more of the other Pennsylvania companies that, at the particular time, might have an excess of available energy which Power might resell to other Pennsylvania customers, or supply to Electric.

■ ■ In short, Power says that the twofold restriction resulting from the basic agreement that (1) Electric shall sell to Power and (2) Power shall not buy from any other source, even though to do so might be more economical, is directly within the prohibition of the literal language of Section 3 of the Clayton Act. But, for the reasons which we have just given, we think that this is not true because the argument fails to take into account the inherent difference between restrictions upon buying and selling as between private enterprises, and similar restrictions as between publicly regulated enterprises. But by this we are not to be understood as saying that regulated industries are per se exempt from anti-trust laws, because such is not the case. See United States v. Borden Co., 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181; State of Georgia v. Pennsylvania R. R. Co., 324 U. S. 439, 65 S.Ct. 716, 89 L.Ed. 1051. What we mean is that there may be a factual situation with respect to public regulated industries, as in the present case, where anti-trust laws are not to be construed as having the same application as they would in a situation involving private enterprises, —that the former situation may be sui generis as counsel for Electric has very aptly, we think, described the situation as respects the corporations here involved. Furthermore, the anti-trust laws do not condemn *all* contracts that restrain trade. The restraint must be unreasonable. See Standard Oil Co. of New Jersey v. United States, 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619, 34 L. R.A.,N.S., 834, Ann.Cas.1912D, 734; Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S. Ct. 982, 84 L.Ed. 1311, 128 A.L.R. 1044; United States v. Bausch & Lomb Co., 321 U.S. 707, 64 S.Ct. 707, 88 L.Ed. 1024; Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013. As was said in the Apex Hosiery Company case, 310 U.S. 469 at page 500-501, 60 S.Ct. at page 996: "In the cases considered by this Court since the Standard Oil case in 1911 some form of restraint of commercial competition has been the sine qua non to the condemnation of contracts, combinations or conspiracies under the Sherman Act, and *in general restraints upon competition have been condemned only when their purpose or effect was to raise or fix the market price.* It is in this sense that it is said that the restraint, actual or intended, prohibited by the Sherman Act are only those which are so substantial as to affect market prices. *Restraints on competition or on the course of trade in the merchandising of articles moving in interstate commerce is not enough, unless the restraint is shown to have or is intended to have an effect upon prices in the market or otherwise to deprive purchasers or consumers of the advantages which they derive from free competition."* (Emphasis supplied.)

Applying the aforegoing test, as established by the Supreme Court, to the facts in the present case, there is absolutely no proof that either the purpose or effect of the basic agreement here in issue has been unreasonably to raise or fix the market price of electrical energy in the areas served by either Electric or Power or in any other area; or that Power or any other purchasers or any consumers of electrical energy have been deprived or are likely to be deprived of any advantages that would have resulted, or would still result from free competition between Electric and Power.

Gibbs v. Consolidated Gas Co. of Baltimore, 130 U.S. 396, 9 S.Ct. 553, 32 L.Ed. 979, which counsel for Power stress as being so strongly indicative of the invalidity of the basic agreement, is clearly not in any sense controlling because factually so different, apart from the contract here in issue having been made and the decision upon it having been rendered in 1884, and 1889, respectively, that is, prior to the time when public utility corporations such as Power and Electric became subject to Federal and State regulatory commissions.

Briefly, the facts in the Gibbs case were that the plaintiff, an individual, sued the defendant, a corporation authorized to make and sell gas in the City of Baltimore, for compensation for services rendered by plaintiff at defendant's request in negotiating and consummating an agreement between defendant and another gas-light company which had also been authorized to make and sell gas in Baltimore, whereby competition between the two companies was eliminated by the pooling of their interests, fixing prices and dividing profits. This agreement was in direct violation of an Act of the Maryland Legislature which expressly prohibited the second company "from entering into any consolidation, combination, or contract with any other gas company whatever; and any attempt to do so, or to make such combinations or contracts as herein prohibited, shall be utterly null and void." Laws Md.1882, pp. 550, 551. On these facts the trial court declared the contract null and void, and re-

fused therefore to allow any recovery to plaintiff. The Supreme Court affirmed.

It is extremely difficult for this Court to understand how counsel for Power could assert as they have done in lengthy brief and argument, that the Gibbs case, and other equally inapposite decisions of the Supreme Court and lower tribunals, should have this Court's serious attention in connection with the issues presently before us.

## The Federal Trade Commission Act.

▆ Section 5 of the Federal Trade Commission Act provides that "Unfair methods of competition in commerce, and unfair or deceptive acts or practices * * *, are hereby declared unlawful." It is thus clear that this statute supplements the Sherman Act. They are sister statutes, and counsel for Electric are correct in maintaining that if the basic agreement does not violate the Sherman Act—and we so find—it therefore does not violate Section 5 of the Federal Trade Commission Act. See Fashion Originators' Guild of America v. Federal Trade Commission, 312 U.S. 457, 61 S.Ct. 703, 85 L.Ed. 949. Furthermore, as respects alleged violations of this Act, redress must first be sought from the Federal Trade Commission, which has not been done by Power. Moore v. New York Cotton Exchange, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750, 45 A.L. R. 1370.

## The Federal Power Act.

▆ Section 10(h) of the Federal Power Act, which is the section that Power contends is violated by the basic agreement, makes it one of the conditions for issuance of licenses under this Act that licensees shall enter into no "combinations, agreements, arrangements or understandings, express or implied, to limit the output of electrical energy, to restrain trade, or to fix, maintain, or increase prices for electrical energy or service [which] are hereby prohibited." In other words this is merely a re-statement of the prohibitions contained in the Sherman Act with

special application to power companies. The basic agreement has been filed with the Federal Power Commission. As a result of a full investigation and hearing the Commission ordered a reduction in the amounts stipulated in the basic agreement to be paid to Power by Electric, and in its opinion (No. 173A) on which its order is based, it said the following (page 8) with respect to the basic agreement: "The regional integration and co-ordination of facilities, the resulting economies, and the utilization and conservation of natural resources thus achieved are precisely what were sought to be encouraged and fostered by the Federal Power Act and established as a part of the criterion of the public interest to be served by regulation thereunder." While it is true this was said in a rate proceeding and the question of whether Section 10(h) of the Federal Power Act had been violated by the basic agreement was not directly in issue, nevertheless, this question was, in effect, answered in the negative.

### Federal Public Policy.

Public policy of the Federal Government as respects monopolies and trade restraints is given definite expression in the several statutes which we have just considered. The meaning of the phrase "public policy" other than as exemplified in these particular laws is not defined or indeed definable with precision insofar as respects a situation such as that here presented. In Steele v. Drummond, 275 U.S. 199, 205, 206, 48 S. Ct. 53, 54, 72 L.Ed. 238, the Supreme Court said: "While the principle [of when a contract is void because contrary to public policy] is readily understood, its right application is often a matter of much delicacy. It is only because of the dominant public interest that one, who has had the benefit of performance by the other party, is permitted to avoid his own obligation on the plea that the agreement is illegal. And it is a matter of great public concern that freedom of contract be not lightly interfered with. Baltimore & Ohio Southwestern Ry. v. Voigt, 176 U.S. 498, 505, 20 S.Ct. 385, 44 L.Ed. 650. The meaning of the phrase 'public policy' is vague and variable; there are no fixed rules by which to determine what it is. It has never been defined by the courts, but has been left loose and free of definition, in the same manner as fraud. 1 Story on Contracts, (5th Ed.) § 675; Pope Mfg. Company v. Gormully, 144 U.S. 224, 233, 12 S.Ct. 632, 36 L.Ed. 414. It is only in clear cases that contracts will be held void. The principle must be cautiously applied to guard against confusion and injustice. Atlantic Coast Line R. R. Co. v. Beazley, 54 Fla. 311, 387, 45 So. 761; Barrett v. Carden, 65 Vt. 431, 433, 26 A. 530, 36 Am.St.Rep. 876; Richmond v. Dubuque & Sioux City R. R. Co., 26 Iowa 191, 202; Egerton v. Earl Brownlow, 4 H.L.Cas. 1, 122; Richardson v. Mellish, 2 Bing. 229, 242, 252. Detriment to the public interest will not be presumed, where nothing sinister or improper is done or contemplated. Valdes v. Larrinaga, 233 U.S. 705, 709, 34 S.Ct. 750, 58 L.Ed. 1163. See also Baltimore & Ohio Southwestern Railway v. Voigt, 176 U.S. 498, 20 S.Ct. 385, 44 L.Ed. 560, which is cited in the above quotation.

To summarize our conclusions with respect to the basic agreement as affected by Federal statutes relating to monopolies and trade restraints, and also by Federal public policy, we find that the basic agreement here in suit does not in any manner contravene any of these, either by the expressed or implied terms of any of its provisions or by their results.

### The Public Policy of Pennsylvania.

Our examination of the Pennsylvania decisions fails to disclose that the basic agreement contravenes in any respect the public policy of the State of Pennsylvania. On the contrary, we find that the main purposes as expressed in and carried out by the basic agreement between Electric and Power have been frequently recognized and approved in Pennsylvania decisions. For example, in Northern Pennsylvania Power Co. v. Pennsylvania Public Utility Commission, 333 Pa. 265, 5 A.2d 133, the Supreme Court of Pennsylvania decided that the Public Utility Commis-

sion had erred in refusing to permit the Northern Pennsylvania Power Company to sell its franchise and all of its property to Metropolitan Edison Co. In so holding, the Court said, 333 Pa. at pages 267–270, 5 A.2d at page 134: "The free alienation of property is an inherent right of the owner under our customs laws and constitutions, subject only to restraining if against the public interest. Therefore, the Northern Company has the right to sell its property, unless it is established by competent evidence, that the sale will adversely affect the public in some substantial way. As we view the record before us, no such evidence was produced.

\*　\*　\*　\*　\*　\*

"Everyone knows that the merger of electric companies has redounded to the public interest, and has enabled them to meet the public requirements growing out of the manifold uses of electricity in this electric age, in a way which smaller units could not have done. Just why the unification of these two companies now under the same management and control would not be to the public interest is nowhere shown by the testimony or logically demonstrated by the reasoning of the commission." See also York Haven Water & Power Co. v. Public Service Commission, 287 Pa. 241, 134 A. 419; Metropolitan Edison Co. v. Public Service Commission of Pennsylvania, Pa.Super., 191 A. 678.

### The Public Policy of Maryland— Article 41 of the Maryland Declaration of Rights.

Our examination of the Maryland decisions likewise shows that they do not condemn agreements such as the one here in issue. In support of this conclusion it is scarcely necessary to do more than quote the following from a decision rendered in 1945 by the Maryland Court of Appeals, Levin v. Sinai Hospital of Baltimore, 186 Md. 175, pages 182–183, 46 A.2d 298, 302, in a suit by a physician to enjoin a private hospital from interfering with his alleged right to treat patients in the hospital's private and semi-private rooms: "Article 41 of the Maryland Declaration of Rights provides 'That monopolies are odious, contrary to the spirit of a free government and the principles of commerce, and not to be suffered.' A monopoly within the prohibition of our Declaration of Rights, is a privilege or power to command and control traffic in some commodity, or the operation of a trade or business to the exclusion of others, who otherwise would be at liberty to engage therein, necessarily implying the suppression of competition, and ordinarily causing a restraint of that freedom to engage in trade or commerce which the citizen enjoys by common right. A monopoly is more than a mere privilege to carry on a trade or business or to deal in a specified commodity. It is an exclusive privilege which prevents others from engaging therein. A grant of privileges, even though monopolistic in character, does not constitute a monopoly in the constitutional sense when reasonably required for protection of some public interest, or when given in return for some public service, or when given in reference to some matter not of common right. Raney v. Montgomery County Commissioners, 170 Md. 183, 183 A. 548; Goldsmith v. Mead Johnson & Co., 176 Md. 682, 7 A.2d 176, 125 A.L.R. 1339."

See also Public Service Commission v. Byron, 153 Md. 164, 138 A. 404, and Mayor and Council of Crisfield v. Public Service Commission, 183 Md. 179, 36 A.2d 705.

### The Effect of Lack of Formal Approval of the Basic Agreement by the Public Utility Commission of Pennsylvania.

The Pennsylvania Commission takes the following position: (1) Since the basic agreement limits the exercise of certain normal powers and functions of Power over which the Commission has regulatory authority, including the right to approve or disapprove any transaction whereby a Pennsylvania public utility directly or by subterfuge leases to another any of its property, powers or privileges, the basic agreement is invalid because not approved by the Commission; and (2) any contract such as the basic agreement which grants

to a foreign corporation the right to determine matters of rates and service of a Pennsylvania public utility is an attempt to deprive the Pennsylvania Commission of its statutory jurisdiction and powers and is, therefore, invalid.

In 1931 when the basic agreement was entered into, the Act of July 26, 1913, P.L. 1374, being part of the Public Service Laws of Pennsylvania, was in effect. Section 3 of Art. 3, of this Act provides that upon the Commission's approval and upon compliance with existing laws, it shall be lawful "for any public service company to sell, assign, transfer, lease, consolidate or merge its property, powers, franchises, or privileges, or any of them to or with any other corporation or person." A substantially similar provision is contained in the present Pennsylvania Public Utility Law, the Act of May 28, 1937, P.L. 1053, Section 202, as amended, 66 P.S. 1122.

■ While we have been referred to no Pennsylvania decision wherein a contract similar to the basic agreement has been interpreted under the Pennsylvania laws above mentioned, we are satisfied there is nothing in the contention that the basic agreement is a lease. Power retains under this agreement full possession and operation of its facilities subject only to the contractual rights given to Electric, the most important of which are Electric's controls over sales of energy to third parties and over additions to Power's plant. Clearly, such controls do not constitute transfers of corporate powers, franchises or privileges. They are merely limitations on powers imposed as a necessary incident to the sale of Power's entire available energy to Electric.

■ With respect to the second contention made by the Pennsylvania Commission that the purport and effect of the basic agreement is to deprive it of its statutory jurisdictions and powers, this, likewise, is believed to be without merit. Even though the basic agreement did not expressly provide that its provisions are subject to the powers and jurisdiction of duly authorized regulatory authorities, such

powers and jurisdiction would remain unimpaired. See City of Chicago v. Chicago Rapid Transit Co., 284 U.S. 577, 52 S.Ct. 2, 76 L.Ed. 501; City of Scranton v. Pennsylvania Public Utility Commission, 268 Pa. 192, 110 A. 775. As said by counsel for Electric in their brief and argument, "The Commission of course did not consider the agreement as a bar to its recent proceedings wherein it ordered reductions in payments to plaintiff from its Pennsylvania utility customers. Nor would it consider the agreement as a bar to appropriate proceedings in Pennsylvania looking for improvement of service to those customers. If the Commission is concerned about services it could and should have done something about it in the exercise of its administrative jurisdiction. Here again is an example of the numerous afterthoughts with which this case is rife. The existence of the basic agreement is nothing new to the Commission. As its counsel admitted in open court it has never attacked the validity of this agreement before."

■ But even if there were any merit in the Pennsylvania Commission's position, we are satisfied that it is now barred by laches from asserting the invalidity of the basic agreement on any ground. This agreement has been on file with the Pennsylvania Commission for sixteen years and during this entire time the Commission has not questioned its validity except through intervention in the present suit. The Pennsylvania Commission is presumed to know the contents and effects of the basic agreement. It has been repeatedly approved by the Maryland Commission. Under these circumstances the Pennsylvania Commission is estopped on the ground of laches from attacking it at this time, that Commission being an agency of the Commonwealth of Pennsylvania against which, under Pennsylvania decisions, the defense of laches may be asserted as well as against private individuals or corporations. See Commonwealth ex rel. Attorney General v. Bala & Bryn Mawr Turnpike Co., 153 Pa. 47, 25 A. 1105; Central District & Telegraph Co. v. Homer City Borough, 242 Pa. 597, 89 A. 681,

Valley Rwys. v. City of Harrisburg, 280 Pa. 385, 124 A. 644; Commonwealth ex rel. Marigiotti v. Union Traction Co., 327 Pa. 497, 194 A. 661.

### Ultra Vires Questions.

We come finally to the remaining attack upon the validity of the basic agreement made by Power which is on the ground of ultra vires, Power claiming that in executing the basic agreement Power's directors acted (1) beyond the authority of corporate directors under Pennsylvania law; and (2) without the authority of Power's stockholders.

A brief chronology of the history of Power since its creation under Pennsylvania law is necessary in order to determine whether there is any merit in this ultra vires argument. First, the organization of Power was accomplished under the Pennsylvania Act of April 27, 1909, 15 P.S. § 571, as a result of the purchase, at judicial sale on December 7, 1909, of the material, rolling stock, property and franchises of the McCall Ferry Power Company. Thus Power succeeded to all the rights of the McCall Company which had been formed on April 1, 1905 by the merger of two other Pennsylvania corporations, namely, the Hillside Water & Power Company and the Susquehanna Water & Power Company, pursuant to the Pennsylvania Act of May 29, 1901, P.L. 349, whereby (section 3) the McCall Company succeeded to "all and singular, the rights, privileges and franchises, heretofore vested in either of the constituent corporations." Thus Power acquired from the Hillside Water & Power Company and the Susquehanna Water & Power Company the powers that their charters gave them. These two corporations were organized in 1902 pursuant to the Pennsylvania corporation law of April 29, 1874, 15 P.S. § 1 et seq., and amendments thereto, "for the purpose of the storage and transportation of water and water power for commercial and manufacturing purposes" and the development and use of electric current and power in conjunction therewith. Each of these corporations thereafter became subject to the Pennsylvania Act of July 2, 1895, Section 1, 15 P.S. § 1404, which provided that with respect to water and water power corporations "heretofore or hereafter incorporated," " * * * it shall and may be lawful for such corporations from time to time to contract with any individual or corporation of this or any other state for the construction, operation, use and maintenance of their works or any part thereof". Accordingly, Power, as successor to these two companies through the McCall Company, acquired and still possesses the express right, under the Act of July 2, 1895, to contract with any corporation of Pennsylvania or any other State for the operation, use and maintenance of its facilities; and, as counsel for Electric rightly contend, a fortiori, Power could contract to place certain controls over that operation, use and maintenance in the hands of another corporation to the extent that it has done under the basic agreement.

Second, with respect to the alleged lack of approval of the basic agreement by Power's stockholders, the following sequence of events relative to the basic agreement is important. The basic agreement is dated June 1, 1931. The first meeting of stockholders of Power subsequent to that date was in February, 1932. The notice of this meeting stated that it was a general meeting called for the election of officers "and the transaction of such other business as may come before the meeting." A general proxy was attached to this notice containing the statement that "a copy of the annual report to be submitted at this meeting will be forwarded to the stockholders not later than January 31, 1932." This annual report was so sent to all stockholders. In it, the basic agreement was referred to in a lengthy description from which we have hereinbefore quoted and therefore will not here repeat. At the ensuing stockholders meeting it was resolved "That the published Annual Report of the Board of Directors to the Stockholders, outlining the activities of the Company during the year 1931, as heretofore mailed to the stockholders, *and the acts of the Directors and Officers in furtherance of the matters therein set forth, be and the same are here-*

*by ratified, approved and confirmed."* (Emphasis supplied).

 We believe that this action of the stockholders is tantamount to their approval of the basic agreement. However, if we assume that it was not legally sufficient to constitute such approval, we believe that counsel for Electric are correct in their contention that both Power and its stockholders are estopped by laches from raising this question in this suit, after the basic agreement has been in existence and in full operation since 1931 by the voluntary acts of both Electric and Power. See Pittsburgh, J., E. & E. Railroad Co. v. Altoona & B. C. Railroad Co., supra. There, the Altoona & Beech Creek Railroad Company had, in 1897, leased its property to the plaintiff railroad for a term of 990 years. In 1889 it gave notice to the plaintiff that the lease was terminated because it was ultra vires and against public policy. Plaintiff thereupon brought suit to restrain the Altoona Company from terminating the lease. The trial court found that the existing statutes did not authorize the lease and accordingly, declared it null and void. However, on appeal the Supreme Court of Pennsylvania reversed the trial court and in the course of its opinion said as follows, part of which we have heretofore quoted but repeat because we believe it is so directly applicable to the present case 196 Pa. 452, at page 467, 46 A. 431, 432: "In the present case the cry of ultra vires is made by a party to the contract,—to the executed agreement from which it has already derived some benefit. If it is ultra vires now, it was ultra vires then, when the contract was solemnly entered into by this appellee, with the full knowledge that there was no connecting line; *and equity will turn a deaf ear for relief from a compact intelligently and deliberately made, when prayed for by a party to it, whose conscience has become quickened only when hopes are disappointed and expectations not realized. If we are asked to give equitable relief to extended hands, they must not only be clean, but unfettered by a contract of their own making."* (Emphasis supplied). Con-

tinuing its opinion, the Court made the following quotation from Oil Creak & Allegany River R. R. Co. v. Pennsylvania Transportation Company, 83 Pa. 160: "It does not appear to have occurred to the defendants below that the contract of July 26, 1871, was ultra vires, until it became apparent that by their subsequent modification of it they had made a bad bargain."

To the same effect are Wright v. Pipeline Co., 101 Pa. 204, 47 Am.Rep. 701; South Side Passenger Rwy. Co. v. Second Ave. Passenger Rwy. Co., 191 Pa. 492, 43 A. 346; McBride v. Western Pennsylvania Paper Co., 263 Pa. 345, 106 A. 720.

 Furthermore, assuming that stockholders' approval was lacking with respect to the basic agreement, only stockholders can assert it. Houghten v. Restland Memorial Park Inc., 343 Pa. 625, 23 A.2d 497; Greene v. Reconstruction Finance Corp., 1 Cir., 100 F.2d 34. The stockholders of Power have been silent for over seventeen years with full knowledge of the existence of the basic agreement derived by them from the corporation's annual reports for years subsequent to 1931. For example, Power in its annual report to its stockholders for the year 1935, after reviewing the various power agreements existing between it and other power companies, including the basic agreement, said as follows with respect to its relations with Electric by reason of the basic agreement and otherwise: "There is no common financial control of your Company and the Baltimore Company, and neither company controls the other. Each company holds less than ten percent of the other company's stock. The intent of the operating contracts is to coordinate the resources (other than financial) of the companies so as to secure economies, efficiency in operation, improved service, maximum utilization of hydraulic potentialities involving river flow, head and storage, lower over-all cost combined with maximum benefits to the companies and an equitable sharing of those benefits." Substantially the same statement is found in Power's annual report for the year 1936. Pennsylvania law, which here governs, treats

474

stockholders who have placed themselves in the position of the stockholders of Power as disclosed by the evidence in the present case, as having acquiesced and ratified their directors' action. See Bonini v. Family Theatre Corp., 327 Pa. 273, 194 A. 498.

 Finally, when we look through form to substance, it is apparent that the sweeping manner in which Power asserts the invalidity of the basic agreement,—on so many widely divergent and completely untenable grounds—we see an underlying motive for the present suit,—a motive, in fact, admitted by counsel for Power in the course of the hearing. It is the desire to prepare the way for Power's complete withdrawal from interstate transmission, purchase or sale of electrical energy, thereby escaping the jurisdiction of the Federal Power Commission and becoming subject exclusively to the jurisdiction of the Pennsylvania Public Utility Commission in the hope that, under the latter, higher rates will be permitted than under the Federal authority which, by recent orders, now on appeal, has already required Power to reduce rates. The Pennsylvania Commission is concurrently contesting the jurisdiction of the Federal Commission over Power's rates.

The basic agreement here in suit has still thirty years to run. That is a long while. It may have been improvident to make an agreement of such long duration, in view of the many and great changes that constantly occur in both urban and rural sections of our country with respect to needs for electrical service. But the agreement's long duration is not sufficient to invalidate it. If in the course of time the public interest in any locality served by either Power or Electric, requires some modification of the basic agreement, the duly constituted regulatory bodies and the Courts have full authority to require such modification, as the agreement itself expressly recognizes.

For the reasons herein given, we find all of the grounds on which Power attacks the validity of the basic agreement here in suit to be untenable. Accordingly, the complaint must be dismissed and Power is required to invoke, in conformity with this Court's earlier opinion, the arbitration provisions of Article X of the basic agreement with respect to any alleged breaches of this agreement by Electric.