PENNSYLVANIA WATER & POWER CO. et al. v. FEDERAL POWER COM- MISSION (two cases).

PENNNSYLVANIA PUBLIC UTILITY COMMISSION v. FEDERAL POWER COMMISSION.

Nos. 10236, 10239, 10531.

United States Court of Appeals District of Columbia Circuit.

Argued Jan. 23–25, 1951.

Decided July 3, 1951.

Dissenting Opinion Oct. 4, 1951.

Writ of Certiorari Granted Feb. 4, 1952. See 342 U.S. 931, 72 S.Ct. 375.

Wilbur K. Miller, Circuit Judge, dissented.

Randall J. LeBoeuf, Jr., New York City, with whom Craigh Leonard, Wilkie Bushby, New York City, Raymond Sparks, F. G. Awalt, Preston C. King, Jr., and Daryal A. Myse, Washington, D. C., were on the brief, for petitioners Pennsylvania Water & Power Co. and Susquehanna Transmission Co. of Maryland.

Charles E. Thomas, Counsel, Pennsylvania Public Utility Commission, Harrisburg, Pa., pro hac vice, by special leave of Court, with whom Thomas M. Kerrigan, Asst. Counsel, Pennsylvania Public Utility Commission, Harrisburg, Pa., was on the brief, for petitioner Pennsylvania Public Utility Commission.

Howard E. Wahrenbrock, Asst. Gen. Counsel, Federal Power Commission, and Reuben Goldberg, Atty., Federal Power Commission, with whom Bradford Ross, Gen. Counsel, Federal Power Commission, Washington, D. C., was on the brief, for respondent.

Charles D. Harris, Gen. Counsel, Public Service Commission of Maryland, Baltimore, Md., for intervenor Public Service Commission of Maryland.

G. Kenneth Reiblich and Alfred P. Ramsey, Baltimore, Md., for intervenor Consolidated Gas Electric Light & Power Co. of Baltimore.

Before WILBUR K. MILLER, BAZELON and FAHY, Circuit Judges.

BAZELON, Circuit Judge.

In 1944, the Federal Power Commission received two petitions—one from the Mayor and City Council of Baltimore and others, the other from the Public Service Commission of Maryland—requesting that it institute an investigation of the justness and reasonableness of the rates and charges of Pennsylvania Water and Power Company and Susquehanna Transmission Company of Maryland[1] with regard to such of their sales or transmission of electric energy as are subject to the Federal Power Act, 16 U.S.C.A. § 791a et seq. By orders issued in September and October of 1944, the Commission assumed jurisdiction and began its investigation of petitioners' rates and charges. Intervention was requested by the Pennsylvania Public Utility Commission, the Maryland Commission, and Consolidated Gas Electric Light and Power Company of Baltimore,[2] all of whom were permitted to and did participate in the hearings before the Commission. Those hearings, which began on April 15, 1946, and continued until July 16, 1947, were extensive in nature and produced a voluminous record. In January 1949, the Commission issued its order requiring Penn Water to reduce its rates and charges in accordance with the Commission's findings. The revised schedules submitted in an attempt to comply with the Commission's order were considered unsatisfactory and, on October 27, 1949,

1. Hereinafter referred to as petitioners or Penn. Water.

2. Hereinafter referred to as Baltimore Company.

the Commission prescribed its own schedules for Penn Water's services. Petitioners seek review of both the January and the October orders, as does the Pennsylvania Public Utility Commission which intervened before the Commission. In addition, the same parties have moved to set aside the orders or to obtain appropriate alternative relief.

The various proceedings before the Commission present a picture of petitioners' operations which is essential to an understanding of the issues now before us. Penn Water owns and operates both a hydroelectric and a steam generating plant at Holtwood, Pennsylvania, which is on the Susquehanna River, some nine miles north of the Pennsylvania-Maryland border. In addition, Penn Water and the Transmission Company together constitute an interconnected interstate transmission system—with Penn Water owning and operating that part of the system which is located in Pennsylvania and Transmission Company, its wholly-owned affiliate, operating the Maryland facilities. A third company, Safe Harbor Water Power Corporation,[3] owns and operates a hydroelectric development at Safe Harbor, Pennsylvania, the transmission facilities of which also interconnect with Penn Water and Transmission Company.

The interest of Baltimore Company in these proceedings stems from certain system foundation contracts which have, for the past twenty years, tied its operations to those of petitioners and of Safe Harbor. Under these contracts, Penn Water is required to provide Baltimore Company at all times with the capacity and energy available at its hydro and steam plants, beyond that part of it which is needed to fulfill its own commitments to customers. Those customers must, however, have been previously approved by Baltimore Company. Baltimore Company is also entitled, by contract, to receive two thirds of Safe Harbor's output and such part of the remaining one third which is left after Penn Water's needs are satisfied. In turn, Penn Water is entitled to receive from Baltimore Company steam energy to the extent that it is available after Baltimore Company's requirements have been met. Nor do the contractual entitlements of Baltimore Company necessarily represent power used by it. Its hydro entitlement is at the disposal of the entire system in order to permit the lowest incremental cost energy to be used as needed at the various parts thereof. In return for the rights granted it under its contract with Penn Water, Baltimore Company assures Penn Water of revenues sufficient to cover all of its operating expenses and a specified return on its investment. Similarly, both Penn Water and Baltimore Company assure Safe Harbor of a combined annual payment which yields a specified return above operating expenses. The function of these contracts and of the interconnection of facilities which they accomplish is, in the words of the Commission, to achieve operations which are "closely integrated and coordinated as a matter of economy, efficiency, flexibility, and maximum utilization of hydro capabilities * * *"[4] of a river which has a very variable flow.[5]

## I

Before considering the various challenges to the Commission's rate order, we will address ourselves to petitioners' motions to set aside and annul that order. These were filed with us on December 29, 1950, shortly after the United States Court of Appeals for the Fourth Circuit had issued a judgment declaring certain phases of the contractual arrangements between Penn Water and Baltimore Company illegal under the federal antitrust laws and the laws of Pennsylvania.[6] The illegality of these

3. Hereinafter referred to as Safe Harbor. This company is affiliated with Penn Water and Baltimore Company, each of which owns fifty per cent of its voting stock.

4. Opinion No. 173 of the Federal Power Commission, Appendix to Petitioners' Brief, p. 43.

5. See discussion, infra, 193 F.2d 240, 241.

6. Pennsylvania W. & P. Co. v. Consolidated G., E. L. & P. Co., 4 Cir., 1950, 184 F.2d 552, certiorari denied 1950, 340 U.S. 906, 71 S.Ct. 282.

system foundation contracts was first raised by petitioners in their petition for rehearing of the January 1949 order, about nineteen months before the Fourth Circuit decision was handed down. The Commission denied the request for rehearing, ruling, *inter alia*, that the validity of the Commission's order is not dependent upon the legality of the contracts under the antitrust laws. Petitioners' position here is that the Fourth Circuit's decision requires us to invalidate the Commission's rate order.

■ The problem raised by the motions is one of the interrelation of two statutory schemes—each of which reflects different historical pressures and different conceptions of the public interest. The Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, and related laws represent an attempt to keep the channels of competition free so that prices and services are determined by the workings of a free market. They derive from the conviction that the greatest good to the greatest number will be attained by preventing monopoly, monopolizing and combinations in restraint of trade. In marked contrast is a statute such as Part II of the Federal Power Act.[7] It evidences congressional recognition that competition can assure protection of the public interest only in an industrial setting which is conducive to a free market and can have no place in industries which are monopolies because of public grant, the exigencies of nature, or legislative preference for a particular way of doing business. In place of competition as a generalized and indirect regulator of prices and services in the field of interstate transmission of electric energy at wholesale, Congress has substituted a regulatory agency authorized to supervise almost every phase of the regulated company's business.[8] Rates charged by such utilities, as well as the services and contractual provisions affecting them, must be "just and reasonable." And what is "just and reasonable" is not determined by the pressures of competition but by the adequacy of the service to the public, the fairness of the return allowed upon the investment in the company, and the degree to which the congressional objective of efficient use of the nation's power resources is served. Nor was Congress unmindful of the problems of undue concentration of power in this field, characterized as it is by local monopolies. In the Public Utility Holding Company Act, 15 U.S.C.A. § 79 et seq., it provided antitrust-like remedies to assure that integration of power companies be limited in scope and confined to an efficient power area.[9]

■ These contrasting objectives indicate that the antitrust laws can have only limited application to industries regulated by specific statutes. Those laws, though quite properly viewed as having been intended "to make of ours * * * a competitive business economy",[10] are not constitutional mandates which freeze all aspects of our economic system for all time into the pattern of "laissez-faire." We think it obvious that they may not be extended beyond that part of the economy which Congress intended to leave to the operation of the free market. "Certainly what Congress has forbidden by the Sherman Act it can modify. * * * [It] is not impotent to deal with what it may consider to be dire consequences of laissez-faire."[11]

---

7. 16 U.S.C.A. § 824 et seq.

8. "In the relationship of government to most private businesses competition is relied upon to control prices in the interests of consumers, but such is not the case with private electric utilities. Competition implies two or more sellers offering their products or services to the same public, and two sellers of electricity in the same territory would mean duplication and wasteful investment. Regulation, therefore, in a general sense may be said to act as a substitute for competition."

Twentieth Century Fund, Electric Power and Government Policy 45 (1948).

9. See Trienens, The Utility Act as a Solution to Sherman Act Problems, 44 Ill.L. Rev. 31 (1949); Comment, Section 11 (b) of the Holding Company Act, 59 Yale L.J. 1088 (1950).

10. United States v. South-Eastern Underwriters Ass'n, 1944, 322 U.S. 533, 559, 64 S.Ct. 1162, 1176, 88 L.Ed. 1140.

11. Sunshine Coal Co. v. Adkins, 1940, 310 U.S. 381, 396, 60 S.Ct. 907, 914, 84 L.Ed. 1263.

Courts have given effect to considerations such as those outlined above by confining the operation of the antitrust laws to those matters which are not the product of state action or which fall outside the reach of power vested in a regulatory agency. Thus, Congress or the states may authorize arrangements among producers even though such action without governmental sanction and enforcement would violate the antitrust laws.[12] Similarly, states may authorize monopolies[13] and Congress may susbstitute direct price fixing by a public agency for competition.[14] But when the practice complained of is not protected by legislative sanction, either directly or by being committed to a commission empowered to deal with it, the antitrust laws have been relied upon as a minimal means of protecting the public interest. The net effect of what we have already said is that, though regulated industries are not *per se* exempt from the antitrust laws and repeals by implication are not favored, the antitrust laws are superseded by more specific regulatory statutes *to the extent* of the repugnancy between them.[15]

That is not to say that competitive considerations may not be components of the public interest sought to be served by a particular regulatory statute, and hence a guide to a commission's exercise of its authority when the question is properly before it. Thus, it has been said that the Federal Communications Act, 47 U.S.C.A. § 151 et seq., "recognizes that the field of broadcasting is one of free competition. The sections dealing with broadcasting demonstrate that Congress has not, in its regulatory scheme, abandoned the principle of free competition, as it has done in the case of railroads, in respect of which regulation involves the suppression of wasteful practices due to competition, the regulation of rates and charges, and other measures which are unnecessary if free competition is to be permitted."[16] But where a statute povides for comprehensive and detailed regulation of a particular industry, as do the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and the Federal Power Act,[17] there is, as we have indicated, only a limited area for application of antitrust considerations to Commission decisions.[18]

12. Parker v. Brown, 1943, 317 U.S. 341, 350–352, 63 S.Ct. 307, 87 L.Ed. 315; United States v. Rock Royal Co-op., 1939, 307 U.S. 533, 560, 59 S.Ct. 993, 83 L.Ed. 1446; United States v. Borden, 1939, 308 U.S. 188, 201–202, 60 S.Ct. 182, 84 L.Ed. 181.

13. Olsen v. Smith, 1904, 195 U.S. 332, 344–345, 25 S.Ct. 52, 49 L.Ed. 224; Lowenstein v. Evans, C.C.S.C.1895, 69 F. 908, 911.

14. Sunshine Coal Co. v. Adkins, 310 U.S. at 395–396, 60 S.Ct. 907, 84 L.Ed. 1263.

15. U. S. Navigation Co. v. Cunard S. S. Co., 1932, 284 U.S. 474, 485, 52 S.Ct. 247, 76 L.Ed. 408; Terminal Warehouse v. Pennsylvania R. Co., 1936, 297 U.S. 500, 514, 56 S.Ct. 546, 80 L.Ed. 827; United States v. Borden, 308 U.S. at 198–201, 60 S.Ct. 182, 84 L.Ed. 181; State of Georgia v. Pennsylvania R. Co., 1945, 324 U.S. 439, 455–457, 65 S.Ct. 716, 89 L.Ed. 1051; U. S. Alkali Ass'n v. United States, 1945, 325 U.S. 196, 205–206, 65 S.Ct. 1120, 89 L.Ed. 1554.

16. Federal Communications Commission v. Sanders Radio Station, 1940, 309 U.S. 470, 474–475, 642, 60 S.Ct. 693, 697, 84 L.Ed. 869, 1037; Mansfield Journal Co. v. Federal Communications Commission, 1950, 86 U.S.App.D.C. 102, 180 F.2d 28. But cf. Mackay Radio & Tel. Co. v. Federal Communications Commission, 68 App. D.C. 336, 338, 97 F.2d 641, 643 (1938) ("Though the Communications Act. forbids the licensing of concerns which violate the anti-trust laws, it does not apply to the radiotelegraph business the policy of free competition, but a contrary policy. Free competition means that all are free to compete. The Communications Act forbids competition by all who cannot prove that their entry will serve the 'public interest, convenience or necessity.'"); Yankee Network v. Federal Communications Commission, 1939, 71 App.D.C. 11, 22, 107 F.2d 212, 223.

17. "The plan or scheme of the Federal Power Act is analogous to that of the Interstate Commerce Act * * *." Northwestern Pub. Serv. Co. v. Montana-Dakota Util. Co., 8 Cir., 1950, 181 F.2d 19, 22, affirmed, 1951, 341 U.S. 246, 71 S.Ct. 692.

18. See McLean Trucking Co. v. United States, 1944, 321 U.S. 67, 84–87, 64 S.Ct. 370, 88 L.Ed. 544.

236

Applying these general propositions to the problem before us, we find that the Fourth Circuit's decision,[19] like that of the Supreme Court in Georgia v. Pennsylvania R. Co.,[20] seeks to assure public utility companies of freedom to exercise their private initiative in promulgating rates, services and changes therein. This limited freedom of action is an important condition precedent to proper operation of the rate-making process. Without it, the rates proposed and approved may tend to find themselves in the upper reaches of the zone of reasonableness within which rates may properly fall. The antitrust laws have been the means of assuring that such initiative remains unchecked by conspiracies or other illegal arrangements with which the regulatory commission is powerless to deal.[21] That is not to say, however, that if otherwise illegal arrangements are permitted or required by a valid statute, they are not shorn of their illegality to that extent.

We construe the Fourth Circuit's decision as having done no more than declare illegal under the antitrust laws certain restraints exercised by Baltimore Company upon Penn Water—such as requiring its approval before it could take on new customers, or expand generating facilities. Those restraints had been privately agreed upon by the parties and submitted to the Commission as an accomplished fact. The court was careful to avoid using language which might be interpreted in such fashion as to affect any rate proceeding then in process. This approach followed the lead of the Supreme Court in State of Georgia v. Pennsylvania R. Co., 324 U.S. at 461–462, 65 S.Ct. 716, 89 L.Ed. 1051. It was pointed out in the Georgia case that issuance of an injunction under the antitrust laws against the conspiracy there charged would in no way affect any rate proceedings. It would merely enable the parties to exercise their initiative with regard to future rate proceedings.

In our view, the Fourth Circuit's opinion neither purported to nor did relieve Penn Water from its obligation under the Federal Power Act to continue the then-existing services and rates. It is those services and rates, reflecting underlying operations, which were the subject of the Commission's order. "A rate is not necessarily illegal because it is the result of a conspiracy in restraint of trade in violation of the Anti-Trust Act. What rates are legal is determined by" the regulatory statute.[22] The validity of Commission action in this proceeding must be determined in light of the criteria furnished by the Federal Power Act, as applied to the operations and arrangements under scrutiny. If jurisdiction was properly assumed by the Commission, if its rate order is "just and reasonable" within the meaning of the Federal Power Act,[23] and if its findings are supported by substantial evidence,[24] Penn Water can have no complaint and our review is at an end. If petitioners, as a result of the Fourth Circuit's decision, wish to make any changes in operations, contracts, arrangements, etc., within the jurisdiction of the Federal Power Commission, they must do so in accordance with the Federal Power Act.[25] Under § 205(d) thereof, "Unless the Commission otherwise orders, no change shall be made by any public utility in any such rate, charge, classification, or service, or in any rule, regulation, or contract relating thereto, except after thirty days' notice to the Commission and to the public."[26] Pursuant to that section, petitioners may submit new arrangements and rates based thereon to the Commission. And the Commission "either upon complaint or upon its own initiative without complaint" may "en-

19. 184 F.2d at 560.

20. 324 U.S. at 459–462, 65 S.Ct. 716, 89 L.Ed. 1051.

21. Georgia v. Pennsylvania R. Co., 324 U.S. at 455, 460.

22. Keogh v. Chicago & N. W. Ry. Co., 1922, 260 U.S. 156, 162, 43 S.Ct. 47, 49, 67 L.Ed. 183.

23. Federal Power Act, § 205(a), 16 U.S.C.A. § 824d (a).

24. Section 313(b), 16 U.S.C.A. § 825l(b).

25. Cf. Michigan Consol. Gas Co. v. Panhandle Eastern Pipe L. Co., 6 Cir., 1949, 173 F.2d 784, 788–789.

26. 16 U.S.C.A. § 824d(d).

ter upon a hearing concerning the lawfulness of such rate, charge, classification, or service * * *." [27] If Penn Water feels itself aggrieved after such proposed changes have been acted upon by the Commission, it may at that time bring a new petition for review. In short, a "rate established in the mode prescribed should be deemed the legal rate, and obligatory alike upon carrier and shipper until changed in the manner provided" by the statute.[28]

To grant petitioners' motions and set aside the order at this time would be to substitute antitrust criteria for those of the Federal Power Act, a substitution which would be at cross-purposes with the intent of Congress. It would result in the reopening of a rate proceeding begun in 1944 because of an issue raised for the first time on rehearing in 1949 and a decision handed down in a suit between private parties under a non-controlling statute in 1951. In view of this chronology, we think the Supreme Court's statement in Interstate Commerce Commission v. Jersey City, 1944, 322 U.S. 503, 514, 64 S.Ct. 1129, 1134, 88 L.Ed. 1420, is especially pertinent: "If upon the coming down of the order litigants might demand rehearings as a matter of law because some new circumstance has arisen, some new trend has been observed, or some new fact discovered, there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening." [29] The effect of granting petitioners' motions would be to disrupt a pattern of regulation which was carefully drawn to meet the problems of a complex industry.

Petitioners rely for their position not only on the effect of the antitrust laws upon a regulated industry but also upon the fact that Penn Water, as a licensee under Part I of the Federal Power Act,[30] is subject to § 10(h) which is said to incorporate Sherman Act standards into the Federal Power Act.[31] Section 10(h) does indeed virtually restate the Sherman Act. But it is found only in Part I of the Federal Power Act, which deals with water-power licensees, and not in Part II, dealing with public utilities selling electric energy in interstate commerce at wholesale. This fact alone would indicate that Congress did not intend to make licensees which are also Part II companies, such as Penn Water,[32] subject to § 10(h).

■ But there is a more fundamental reason for holding § 10(h) inapplicable to Part II companies. The very thing which that section prohibits, the combination of licensees with others to limit the output of electrical energy, is made one of the primary objectives of Part II. Section 202(a) [33] thereof imposes the duty upon the Commission to encourage public utilities to combine for the interconnection of facilities. Under certain circumstances, the Commission may even order such interconnections and regulate the rates and contractual arrangements involved therein.[34] The end thus sought to be achieved and, in the Commission's view, served by the present arrangement between Penn Water and Consolidated, is the most efficient use of the nation's resources consistent with the public interest in cheap power and in conserva-

27. Section 205(e), 16 U.S.C.A. § 824d(e).

28. Robinson v. Baltimore & Ohio R. R., 1912, 222 U.S. 506, 510, 32 S.Ct. 114, 115, 56 L.Ed. 288.

29. See United States v. Pierce Auto Lines 1946, 327 U.S. 515, 535–536, 66 S.Ct. 687, 90 L.Ed. 821.

30. Penn Water was ordered to apply for a license under Part I in 1939. See Pennsylvania Water & P. Co. v. Federal Power Commission, 1941, 74 App.D.C. 351, 123 F.2d 155. According to the Commission's opinion here, no license has yet been issued. See Opinion No. 173,

Federal Power Commission, Appendix to Petitioners' Brief P. 58, n. 21.

31. That section, 16 U.S.C.A. § 803(h), provides: "Combinations, agreements, arrangements, or understandings, express or implied, to limit the output of electrical energy, to restrain trade, or to fix, maintain, or increase prices for electrical energy or service are hereby prohibited."

32. See Discussion, infra, 193 F.2d 238, 240.

33. 16 U.S.C.A. § 824a(a).

34. Id. § 824a(b).

238

tion. We are unable to accept the proposition that Congress intended to have § 10(h) prevent that which is contemplated by Part II, a statute which is later in time and more specific in application. Our view is supported by the fact that § 10(h) is found in that part of the Act which establishes a limited federal regulatory scheme—one which does not come into play unless (1) the state in which the licensee is located has no regulatory commission, or (2) the state commissions involved are unable to agree upon rates for interstate sales.[35] It seems entirely likely that Congress believed that, in the absence of detailed federal regulation such as that in Part II, licensees should be required to adhere to antitrust standards. This is, in effect, saying no more than what we have already said about the antitrust laws and regulated industries. The prohibitions of § 10(h) would apply to a licensee which is also regulated under Part II only to the extent that the prior statute is not repealed by the clear repugnancy between it and the later statute.

The motions to set aside or to remand the Commission's orders on the basis of the Fourth Circuit's decision and the other points referred to above are denied.

## II

The Federal Power Commission assumed jurisdiction of petitioners' rates and services pursuant to both Parts I and II of the Act. Petitioners challenge this assumption of jurisdiction on the ground that licensees may be regulated only under Part I and that the Commission's finding that the states involved are unable to agree, which is a condition precedent to federal jurisdiction under Part I, is not supported by the evidence.

Part I applies to all federal water-power licensees, whether operating in intra- or interstate commerce. It makes Federal

Power Commission regulation of the interstate operations dependent upon either (1) the non-existence of a state regulatory commission in the licensee's state, or (2) the inability of the states involved in the licensee's interstate activities to agree.[36] Part II is not so qualified. It confers broad authority upon the Commission to regulate the rates, services, etc., of all public utilities which own and operate facilities engaged in the "transmission of electric energy in interstate commerce" and in "the sale of electric energy at *wholesale* in interstate commerce".[37]

If the Commission is correct in its view that petitioners' present operations are interstate in nature and involve the transmission and sale of electric energy at wholesale, a question we will discuss *infra*,[38] then they are drawn within the express language of Part II unless the existence of Part I requires that we read an implied exception for licensees into Part II. Such a construction might appear more plausible if § 201(f)[39] of Part II did not specify those to whom that Part was not intended to apply. That section conspicuously makes no reference to Part I licensees. It seems unlikely that Congress would not have included so important a group as federal water-power licensees among the specific exceptions to Part II if it had actually intended to except them.

The only judicial utterances cited to us in this regard are to the effect that " 'Part II, as added in 1935, gives the Commission jurisdiction over the transmission and sale of electricity at wholesale in interstate commerce, whether or not by licensees,' "[40] and that the Safe Harbor Company "is not only a *licensee* under Part I but it is also a *public utility* under Part II".[41] Neither Alabama Power Co. v. Federal Power Commission[42] nor Niagara Falls Power Co.

35. Federal Power Act, §§ 19, 20, 16 U.S.C.A. §§ 812, 813.

36. Section 20, 16 U.S.C.A. § 813.

37. Section 201(b), 16 U.S.C.A. § 824(b). (Emphasis supplied.)

38. See 193 F.2d 240, 241.

39. 16 U.S.C.A. § 824(f).

40. Safe Harbor Water Power Corp. v. Federal Power Commission, 3 Cir., 1941, 124 F.2d 800, 804 n. 4.

41. Safe Harbor Water Power Corp. v. Federal Power Commission, 3 Cir., 1949, 179 F.2d 179, 185, certiorari denied 1950, 339 U.S. 957, 70 S.Ct. 980, 94 L.Ed. 1368.

42. 1942, 75 U.S.App.D.C. 315, 328, 128 F.2d 280, 293.

v. Federal Power Commission,[43] both of which contain language which might be thought to run counter to Part II jurisdiction over a licensee, was a rate case. Neither involved Part II and the possibility of conflict between Parts I and II was not discussed.

Legislative history bearing directly on the point also supports application of Part II to licensees. For example, Representative Rayburn, Chairman of the House Committee reporting the bill, pointed out that there was no need to make certain prohibitions contained in § 305(a), 16 U.S.C.A. § 825d(a), specifically applicable to licensees because they had already been made applicable to "public utilities" generally. He said, "The Senate bill includes licensees within the provisions of this section, but inasmuch as such licensees when interstate operating public-utility companies will be subject to the provisions of the section in any event, licensees have been omitted from the bill as reported, because of the lack of public interest in those companies which are not public utilities."[44]

We consider Part II to have occupied the field with regard to interstate wholesale rates of electric companies. It filled a gap in state regulation of electric companies which had been created by the Supreme Court's decision in the Attleboro case.[45] That case made it clear that interstate wholesale rates, as distinguished from interstate retail rates,[46] were beyond the reach of state regulatory Commissions.[47] The new legislation required to bring such rates under federal control, Part II, was drawn in 1935 with an eye to the peculiar problems of wholesale electric companies and in light of the considerable experience with such companies which had been gleaned in the fifteen years since the Federal Water Power Act had been drafted in 1920. It was apparent to Congress that application of this later scheme of regulation to the interstate wholesale rates of non-licensees alone would have created disparate regulatory treatment of licensees and non-licensees engaged in similar activities. Since this would have conflicted with the objective of Part I, which places primary emphasis upon state regulation in order to make treatment of licensees as much like that of ordinary state public service companies as possible, Congress conferred authority upon the Federal Power Commission to occupy the entire field of regulation of interstate wholesale rates, whether those of licensees or non-licensees. All other rates of licensees, whether engaged solely in intrastate activities or in interstate retail selling, were left to the regulatory scheme provided in Part I. Thus, even if Part I was intended to confer jurisdiction upon the states or the Federal Power Commission to regulate interstate wholesale rates, it was to that extent repealed by Part II.

The only problem suggested to us which may arise from such a construction is that, in the event of recapture by the United States of the site awarded to a licensee, which is also a public utility, payment would have to be made pursuant to a valuation formula contained in Part I, which is said to differ from that used for rate-making in Part II. We hardly think that the intention of Congress to reach all public utilities, whether licensees or non-licensees, under Part II can be ignored in order to eliminate the possibility that there may some day be an occasion for valuation of the property in a manner different from that provided for in Part II. The applic-

43. 2 Cir., 1943, 137 F.2d 787, 792–793.

44. H. R. Rep. No. 1318, 74th Cong., 1st Sess., p. 31 (June 24, 1935).

45. Public Utilities Commission v. Attleboro Co., 1927, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549. See Jersey Central Co. v. Federal Power Commission, 1943, 319 U. S. 61, 67–68, 63 S.Ct. 953, 87 L.Ed. 1258; Hartford Electric Light Co. v. Federal Power Commission, 2 Cir., 1942, 131 F.2d 953, 964.

46. Pennsylvania Gas Co. v. Public Service Commission, 1920, 252 U.S. 23, 40 S. Ct. 279, 64 L.Ed. 434.

47. See discussions in Illinois Natural Gas Co. v. Central Illinois Public Service Co., 1942, 314 U.S. 498, 504–505, 62 S.Ct. 384, 86 L.Ed. 371; Panhandle Pipe Line Co. v. Federal Power Commission, 1947, 332 U.S. 507, 514–515, 68 S.Ct. 190, 92 L.Ed. 128.

ability of Part II to licensees would create no greater effect than would the usual pre-Part II situation, under which a state commission would ordinarily have been regulating the licensee's activities under its own regulatory statute prior to recapture.[48] We note, however, that the Third Circuit has pointed out the essential sameness of the valuation formulas of Parts I and II.[49]

In view of our position with regard to the applicability of Part II, it is unnecessary for us to examine the sufficiency of the evidence in the record to support the Commission's finding under Part I that the Maryland and Pennsylvania commissions are unable to agree. But in the event that the Part I question should arise on appeal from our decision, we note that we have examined the record and find substantial evidence to support the Commission's finding on this point.

### III

Rejection of petitioners' view that Part I furnishes the sole authority for federal regulation of their operations brings us to the contention that all or almost all their sales are intrastate in nature and hence may not be regulated under Part II. It is said that (1) Penn Water's sales to its Pennsylvania customers for resale are sales of electric energy produced and sold in Pennsylvania; (2) the back-feed energy generated by Baltimore Company to Penn Water and sold by it to its Pennsylvania customers loses its interstate character when it is received by Penn Water and comingled with the Pennsylvania-produced energy. Even if these sales of back-feed are considered interstate, it is suggested that they constitute so negligible a portion of Penn Water's total sales to Pennsylvania customers that they cannot furnish the basis of federal regulation, or that federal regulation may extend only to an allocable portion of interstate sales.

Section 201(b) of the Federal Power Act[50] makes Part II applicable "* * *

to the transmission of electric energy in interstate commerce and to the sale of electric energy at wholesale in interstate commerce, but shall not apply to any other sale of electric energy or deprive a State or State commission of its lawful authority now exercised over the exportation of hydroelectric energy which is transmitted across a State line. The Commission shall have jurisdiction over all facilities for such transmission or sale of electric energy, but shall not have jurisdiction, except as specifically provided in sections 824-825r of this title, over facilities used for the generation of electric energy or over facilities used in local distribution or only for the transmission of electric energy in intrastate commerce, or over facilities for the transmission of electric energy consumed wholly by the transmitter."

We are convinced from an examination of the voluminous materials submitted to us that the Commission properly found Penn Water to be part of an "integrated and coordinated interstate electric system."[51] Energy generated at Safe Harbor and Holtwood flows south to Baltimore and, at times, Baltimore-generated energy moves north along the same line to Safe Harbor and Holtwood where it, together with energy generated there, is delivered to Penn Water's Pennsylvania customers. This movement to and fro is made necessary by the varying electric loads which must be supplied at various times of the day. The flow of the Susquehanna River, which is the source of Penn Water's hydro power, is too irregular to carry unaided the large utility loads it is often called upon to handle. Thus, during the river's low periods, hydro power is scarce and Baltimore Company's steam generators are used to "firm up" or keep constant the output of the hydro plants. At such times, the hydroelectric generators are operated only at the peak of the load and, during off-peak hours, the river flow is impounded in plant reservoirs for subsequent use at peak periods. Conversely, during the periods when the

48. See Safe Harbor Water Power Corp. v. Federal Power Commission, 3 Cir., 179 F.2d at 187.

49. Id. 179 F.2d at 188.

50. 16 U.S.C.A. § 824(b).

51. Opinion No. 173, Federal Power Commission, Appendix to Petitioners' Brief, p. 51.

river is high, Penn Water's hydroelectric plants are used to supply the heavy loads in both Pennsylvania and Maryland which would otherwise have to be supplied by the more expensive steam generation.

As a result of the carefully coordinated operations of the participants in this interstate energy pool, Penn Water reaps the benefit of Baltimore's considerable and constantly available steam capacity while Baltimore Company enjoys the benefits of the cheaper hydroelectric energy. The activities of each are so meshed that the peak demands of the customers of each can be met easily at all times and with the most economic source of power then available. As the Commission has pointed out, the arrangements now in existence have been "carefully worked out" to meet the needs of the interstate system "as to firm energy requirements, while operations involving firm, interchange and emergency energy are conducted at all times by a dispatching system controlled by a dispatcher's office in coordination with various operating committees. * * * the constituent companies of this interconnected system plan and coordinate far in advance steam maintenance schedules which are based largely upon the predicted flows of the Susquehanna River and the determination of the availability of hydro energy during periodic steam maintenance outages."[52] Because such an energy pool, drawing upon the extensive steam and hydro capacities of Penn Water, Safe Harbor and Baltimore Company now exists, both Penn Water and Baltimore Company have been able to satisfy commitments which would otherwise be outside their individual capacities, as they are now constituted. Given such interconnected and integrated interstate wholesale operations, there can be no such thing as assigning a particular sale solely to operations within Pennsylvania. Each sale is in effect a pool sale drawn from the integrated interstate system and hence interstate in nature.

The same conclusion was reached by the Third Circuit with regard to another of the participants in this pool, Safe Harbor. The court pointed out that Safe Harbor is "part of a large integrated interstate electric system" and that its electric output "must be treated as an integrated whole."[53] In the second Safe Harbor case, the court again held that Safe Harbor's sales "constitute in fact wholesale sales in interstate commerce" because they are "delivered to an integrated interstate electric system".[54]

We find substantial evidence in the record to support the Commission's factual findings with regard to the interstate nature of Penn Water's sales. It is the nature of the operations underlying the sales which furnishes the basis for Commission action rather than legalistic niceties of title and place of sale.[55] Those operations bring petitioners' rates and services within the reach of Part II of the Federal Power Act. The Commission did not assume jurisdiction over any direct consumer sales. It "was meticulous to take in only territory which this Court had held the states could not reach"[56]—interstate sales at wholesale.

IV

Penn Water challenges the Commission's determination of rate of return and its calculation of the rate base on both legal and evidentiary grounds. Ever since Hope Natural Gas[57] was decided, such challenges have become in-

52. Id. at p. 43.

53. Safe Harbor Water Power Corp. v. Federal Power Commission, 3 Cir., 124 F.2d at 802, 807.

54. 179 F.2d at 185 n. 9. See also Jersey Central Co. v. Federal Power Commission, 1943, 319 U.S. 61, 63 S.Ct. 953, 87 L.Ed. 1258; Hartford Electric Light Co. v. Federal Power Commission, 2 Cir., 1942, 131 F.2d 953, 956–958.

55. Illinois Natural Gas Co. v. Central Illinois Public Service Co., 1942, 314 U.S. 498, 503–504, 62 S.Ct. 384, 86 L.Ed. 371; Jersey Central Co. v. Federal Power Commission, 1943, 319 U.S. 61, 69 et seq., 63 S.Ct. 953, 87 L.Ed. 1258.

56. Cf. Panhandle Pipe Line Co. v. Federal Power Commission, 1947, 332 U.S. 507, 519, 68 S.Ct. 190, 196, 92 L.Ed. 128.

57. Federal Power Commission v. Hope Natural Gas Co., 1944, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333.

creasingly difficult to sustain. That case established the proposition that the Federal Power Commission is " 'not bound to the use of any single formula or combination of formulae in determining rates', so long as the 'total effect,' 'impact' or 'end result' of the rate order 'cannot be said to be unjust or unreasonable.' The limits set by the Court are deliberately broad, resulting both from notions of special competence and the conception of rate-making as a primarily legislative process. So long as the public interest—i. e., that of investors and consumers—is safeguarded, it seems that the Commission may formulate its own standards." [58] The "Commission may adopt any method of valuation for rate base purposes so long as the end result of the rate order 'cannot be said to be unjust and unreasonable'." [59] If a rate order produces "adequate revenues above operating expenses (including depreciation) to pay interest on the bonds, dividends on the stock and, in general, maintain the financial integrity of the enterprise",[60] it will not be disturbed. It still remains for us, however, to examine the theory upon which the Commission purported to act and to assure that its action was within the realm of allowable discretion and supported by substantial evidence.

*a. Rate of return*

■ Turning first to that part of Penn Water's petition which is addressed to rate of return, we find it argued that the 5¼ per cent allowed by the Commission on that part of the bonds and stock representing actual investment does not satisfy the test established in Hope and referred to above. Determination of the fairness of a rate of return requires "a study of the capital costs of the business, such as service on the debt and dividends on the stock, in the light of returns on investments in other enterprises having a similar risk factor. Only

upon such evidence can the Commission determine what is required 'to assure confidence in the financial integrity of the enterprise, so as to maintain its credit and to attract capital.' " [61] This "standards of finance resting on stubborn facts" [62] was satisfied by the Commission which carefully investigated Penn Water's position in relation to that of other utilities and concluded that it was less subject to risk than are most other utility companies. The assurance it receives from Baltimore Company, under presently existing arrangements, of revenues sufficient to cover operating expenses and a fair return on its investment removes much of even the small amount of risk ordinarily found in public utility companies. To refer, as Penn Water does, to the extraordinary risk involved in the abatement of Baltimore Company's payments to it if it fails to deliver energy because of acts of God is to illustrate how carefully insulated Penn Water really is from any substantial risk. Nor is the variability of the flow of the Susquehanna a substantial risk factor at present since Baltimore Company's payments to Penn Water are not dependent upon the latter company's output.

It does not prove Penn Water's case to point to the higher than 5¼ per cent return earned by the average utility. Safe Harbor, for example, was allowed only a five per cent return by the Commission. On review, the Third Circuit said, " * * * It would be difficult to conceive of a more secure hydroelectric project" [63] and affirmed the rate order. In view of the similarity of their market and financial arrangements, it would seem that Penn Water's risks approximate Safe Harbor's more than they do those of the "average" utility. "Each utility presents an individual problem." [64] Stability of market and income, proximity of the company to the capital markets, a long history of satisfactory earnings—all

58. Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 115, 188 F.2d 11, 14–15, certiorari denied 1950, 340 U.S. 952, 71 S.Ct. 571.

59. Id., 188 F.2d at p. 18.

60. Id., 188 F.2d at p. 15.

61. Id., 188 F.2d at page 16.

62. Colorado Interstate Co. v. Federal Power Commission, 1945, 324 U.S. 581, 605, 65 S.Ct. 829, 840, 89 L.Ed. 1206.

63. 179 F.2d at 199.

64. Driscoll v. Edison Light & Power Co., 1939, 307 U.S. 104, 119–120, 59 S.Ct. 715, 722, 83 L.Ed. 1134.

these are factors which go into the complex of fair return. Under the circumstances of this company, the Commission thought a 5¼ per cent return applied to the rate base and designed to provide 3.17 per cent for bonds, 5.21 per cent for preferred stock and 8.64 per cent for common stock and surplus was "fair." We think the Commission had substantial evidence before it to support its findings of fact on this phase of the case and that the rates allowed meet the test laid down in the Hope case. Nor do we think that a rate of return based upon the historical cost of capital or petitioners' milder approximation thereof, the competitive cost of capital, is a necessary part of that test. We think it sufficient to point out that cost of capital studies such as the one presented to the Commission have withstood judicial review in too many cases for us to reject the one now before us as a proper criterion of rate of return.

b. *Rate base*

 Petitioners contend that the Commission improperly excluded more than two million dollars from the amount found by it to be the gross investment in property used and useful in the public service. Commission deduction of the reserve for depreciation from the gross investment in arriving at the net investment rate base is also challenged. The propriety of such a deduction under a regulatory formula like that in Part II is too well settled to warrant our discussing it at this time. Nor would Part I, if applicable, require a different conclusion.[65] As to the items excluded from the rate base, we think the Commission acted properly and upon substantial evidence. We will discuss only the more important of them:

1. *Flashboard developement costs*—The Commission included in the rate base the cost incurred in 1911 and 1912 in connection with the original installation of the project flashboard system but excluded almost $50,000 expended from 1913 to 1921. Such ex-

penditures were for renewal of flashboards or for experimentation and testing in regard to improvement of flashboards, which experiments were ultimately abandoned. The record discloses that flashboards must be replaced so often, as a result of being carried away in whole or in part by high water, that expenditures in connection therewith are properly treated as operating expense and hence not includible in the rate base. Nor need the Commission include in the rate base abandoned experiments which do not manifest themselves in property useful in the public service.[66] There is ample evidence in the record to demonstrate that these experiments neither were necessary to nor contributed to the flashboard improvement ultimately adopted.

2. *Interest during construction*—The Commission allowed 6 per cent interest on construction costs during the period of construction to be included in the rate base on the theory that "during the period of construction 'there is no operating income available with which to meet these necessary charges incident to construction.' "[67] But Penn Water disputes the finding that there was a cessation of construction for 22 months during the more than six year period of construction and the attendant exclusion from the rate base of interest for that period, amounting to over $700,000. Penn Water also objects to exclusion of other losses found by the Commission to be traceable to the cessation of construction. "To justify allowance of interest during construction as part of the cost of the project it must appear that the licensee carried out his obligation * * * to prosecute the construction with due diligence."[68] Here, the cessation of construction was due to the inability of Penn Water to obtain funds after it found that its financing was inadequate. Even if it be conceded that the financial market at the time of cessation of construction was as unsettled as Penn Water says, it does not follow that rate payers

65. Safe Harbor Water & Power Corp. v. Federal Power Commission, 3 Cir., 179 F.2d at 194.

66. Pennsylvania Power & Light Co. v. Federal Power Commission, 3 Cir., 1944, 139 F.2d 445, 452.

67. Puget Sound Power & Light Co. v. Federal Power Commission, 1943, 78 U.S. App.D.C. 143, 144, 137 F.2d 701, 702.

68. Ibid.

should now bear the burden of its failure to provide adequate financing in advance of construction to sustain the entire project. Such losses are as much due to a risk of the business as were the losses excluded from the rate base in the Puget Sound case. We agree with the Commission's view, expressed in its brief, that "Interest on the idle investment and other losses due to financial inability to go into operation as soon as the physical conditions of normal construction would permit are no more to be recouped from rate payers in later years than past losses in operation * * *." [69]

3. *Claimed costs from issuance of common stock for properties*—Twenty thousand shares of common stock in Penn Water's predecessor, McCall Ferry Power Company, were issued as part payment for certain properties. These shares are said to represent $500,000 in plant cost which should be included in the rate base. There was substantial evidence to support the Commission's conclusion that almost all the shares were acquired by one Hutchinson in a transaction which was not at arm's length and represented a profit beyond the cost of the properties to him. Hutchinson was part of a group which pooled properties and banking services necessary for the project and issued stock to itself beyond what the Commission found to be proper compensation for properties and services. Under such circumstances, especially since "neither party had any interest to reduce the nominal capitalization",[70] the stock represented paper capitalization of anticipated profits rather than actual corporate assets. Commission exclusion of the 20,000 shares resulting from this transaction was merely an elimination of the water in the stock as measured by the estimated original cost of the plant.

4. *Expenditures previously charged to operating expense or to depreciation reserve*—These expenditures total almost $100,000. They were properly excluded from the rate base because they have already been recovered by investors in the form of annual charges to operating expenses and depreciation reserve.[71]

V

The Commission found that Baltimore Company was entitled to $1,733,318 of the total rate reduction of $1,954,261 ordered by it, based on 1946 operations. This allocation is challenged by petitioners who argue, *inter alia*, that it is based upon (1) an incorrect reading of certain governing contract provisions; (2) an incorrect measure of the cost of steam generated energy and capacity supplied by Baltimore Company and Penn Water; (3) an improper overstatement of revenues due to Baltimore Company from Penn Water. In view of what we have already said about the effect of the Fourth Circuit decision upon this rate proceeding, supra, 193 F.2d 233–238, there there is no need to consider whether the various contracts involved herein are part of an arrangement declared illegal under the antitrust laws.

(1) Penn Water's generating capacity alone is inadequate to meet its commitments to its Pennsylvania customers. It makes up the deficiency in part through use of its contractual entitlement to one third of Safe Harbor's output and, to the extent of a deficiency thereafter, by diversion of part of Baltimore's two-thirds entitlement to Safe Harbor's output. The Commission included this diversion from Baltimore Company's entitlement as energy supplied by Baltimore to Penn Water for which Baltimore was entitled to a credit against Penn Water's cost of services to it. Penn Water argues, however, that the 2:1 entitlement to Safe Harbor's output does not arise until *after* Safe Harbor has met obligations, which it shares *jointly* with Penn Water, to certain of Penn Water's Pennsylvania customers. Such a reading of the contract would mean that the energy said to be diverted from Baltimore Company by Penn Water to satisfy those customers was not Baltimore's at

69. Respondent's Brief, pp. 71–72.

70. Niagara Falls Power Co. v. Federal Power Commission, 2 Cir., 1943, 137 F. 2d 787, 793.

71. See Federal Power Commission v. Natural Gas Pipeline Co., 1942, 315 U.S. 575, 591, 62 S.Ct. 736, 86 L.Ed. 1037; Washington Gas Light Co. v. Baker, 88 U.S.App.D.C. 124, 188 F.2d at 20.

all and hence that no credit would be due to it. Penn Water's view proceeds from its assumption that since Safe Harbor is a party to the contracts referred to, it is obligated thereunder and that such contracts are obligations "to serve imposed on [it] * * by law" which are specifically exempted from the 2:1 entitlement arrangement.

We think the evidence before the Commission amply disclosed that Safe Harbor was merely a nominal party to the contracts with the Pennsylvania companies and that it was made such as part of a short-lived attempt to obtain certain tax advantages. That attempt was never brought to fruition. If it had been, it would have resulted in a change of the three-way contract to provide that Baltimore and Penn Water "would purchase the *balance* of the Safe Harbor output in the proportion of two-thirds and one-third respectively." This contemplated change, which was never made, would have accomplished what Penn Water would like us to do even without the change. The three-way contract has consistently been interpreted by Safe Harbor and Penn Water in reports to stockholders and to various regulatory agencies as making a 2:1 division of Safe Harbor's entire output between Baltimore Company and Penn Water. And the same construction of the contract was referred to in the second Safe Harbor case when the court said, "Safe Harbor's output is delivered to an integrated interstate electric system under the terms of the so-called '1931 contract', two-thirds of the energy being sold to the Maryland Company [Baltimore Company] and the remaining one-third going to the Pennsylvania Company [Penn Water]." [72]

The materials before the Commission were hardly consistent with the interpretation now sought by Penn Water. They pointed instead to the view, adopted by the Commission, that Baltimore Company had a two-thirds entitlement from Safe Harbor which was diverted by Penn Water in order to satisfy its Pennsylvania commitments.

(2) Penn Water contends that, even if Baltimore Company's energy was diverted by it for use in fulfilling its Pennsylvania commitments, the Commission erred in the basis used by it for computing the resultant credit owing from Penn Water to Baltimore. Pointing to Article VII of Safe Harbor's Rate Schedule, Penn Water says that the credit should be based upon Safe Harbor's hydro costs rather than Baltimore Company's steam generated costs. We agree with the Commission's view that Article VII does not apply to voluntary diversions of energy such as are involved here. It applies only to failure of Penn Water, through impairment of its transmission facilities, to transmit Safe Harbor energy to Baltimore Company. There was no such impairment here but instead, there was a diversion at Penn Water's request and with Baltimore's consent, of part of the latter company's entitlement. If Penn Water's view were to prevail and it were to pay Baltimore only the hydro costs, Baltimore Company would have no incentive to permit diversion of its hydro entitlement. Such diversion requires it to use its more expensive steam generating facilities, a use for which it is compensated by Penn Water's payment of the cost of such steam generation to the extent it replaces Baltimore's hydro entitlement. This arrangement benefits Penn Water because it is enabled to satisfy commitments it could not otherwise undertake by paying the cost of the least expensive steam energy available at the time of need. Similarly, it is beneficial to Baltimore Company because it brings the less expensive hydro power into its system. The conclusions of the Commission on this point are proper and are supported by substantial evidence.

(3) The Commission included as part of Penn Water's cost of service to Baltimore Company the cost of energy sold by Penn Water as economy interchange—energy generated at a lower cost plant and used to replace generation at a higher cost plant—to certain of its Pennsylvania customers. And as part of what Penn Water owed to Baltimore Company, the excess revenues derived from such sales "for Baltimore's account" were included. The evidence supports the Commission's view that Baltimore Company is entitled to all of Penn

72. 179 F.2d at 184–185 n. 9.

Water's output and of Penn Water's one-third Safe Harbor entitlement remaining after Penn Water's firm power obligations to its Pennsylvania customers are met. The sales of interchange energy were sales of energy diverted from Baltimore Company's entitlement and, as such, Baltimore was entitled to the revenues therefrom less, as we have indicated, payment to Penn Water for its cost of service.

## VI

Penn Water raises many other points which, in its view, constitute error requiring us to reverse in part or to remand. Many of these points involve just the sort of weighing of evidence and making of pragmatic adjustments which fall within the special competence of an expert agency and which should not be interfered with by a court unfamiliar with day-to-day operations and complex technological and financial materials. Our review is designed to leave to the Commission the flexibility which is necessary if it is satisfactorily to discharge its function of protecting the public interest, and yet to prevent arbitrary action outside the scope of the Commission's authority. We have examined all the points raised and are convinced that the Commission's treatment of each one was within the range of its statutory authority and was supported by substantial evidence.

The motions to set aside the Commission's orders or to remand are denied and those orders are

Affirmed.

WILBUR K. MILLER, Circuit Judge (dissenting).

It is my view that this court should have granted petitioners' motions to annul the rate reduction orders of the Federal Power Commission. The decision of the United States Court of Appeals for the Fourth Circuit, 184 F.2d 552, which held null and void the contractual arrangement between Pennsylvania Water & Power Company and Consolidated Gas Electric Light and Power Company of Baltimore, to which the orders were intended to apply prospectively, imperatively required that the case before us be remanded to the Commission to work out with the utilities some different plan for interchange of energy which would not violate any state or federal law and which would not be contrary to public policy. This should have been done because the Commission's orders stood in a vacuum after the Fourth Circuit held the contract invalid; the only service to which they can have application may not lawfully be continued.

But the Commission has ordered the two companies to continue to observe and be governed by all the provisions of the old contract which are "in and of themselves lawful,"—a qualification which overlooks the fact that the Fourth Circuit condemned the contract in its entirety. And the majority of this court apparently hold that the Power Commission has authority to cause the *whole* contract to remain in effect, since they conclude that federal anti-trust laws do not apply to utilities regulated under Part II of the Federal Power Act. Relying on that theory, my brethren say, "The motions to set aside or to remand the Commission's orders on the basis of the Fourth Circuit's decision and the other points referred to above are denied."

It is thus clear that, despite the voluminous record in this case,[1] the numerous and sometimes lengthy briefs, and three days of oral argument, the basic issue is a simple one. Has the Federal Power Commission authority to order a combination of these two utilities under terms and conditions which, if arranged by private contract between them, would clearly violate the federal anti-trust laws and the public utility laws of Pennsylvania? If the Commission has such power, the majority have correctly denied the motions to annul and remand. If not, then those motions should have been granted. Before discussing what I regard as the basic question, it may be well to review somewhat in detail the pro-

---

1. The Power Commission filed with us a transcript in 75 volumes containing an aggregate of 26,876 pages. Appendices prepared by the parties abbreviated that bulk to 17 volumes containing 5,338 printed pages.

ceeding before the Power Commission and the litigation in the Fourth Circuit.

## I.

The Commission instituted in September, 1944, an investigation of the rates and charges of Penn Water, following which it entered an order on January 5, 1949, requiring a large reduction in Penn Water's annual revenue. The major portion of the reduction was allocated ·to Consolidated; indeed, the reduction ordered in Penn Water's charges against that company exceeded by approximately $500,000 the sum which ·Consolidated had paid Penn Water during the "test year" of 1946. The Commission interpreted the 1931 contract as entitling Consolidated to all Penn Water's energy except that required to meet its firm commitments to other customers; as a result of that interpretation the Commission concluded that very substantial sales by Penn Water to others had really been for the account of Consolidated, and allocated the reduction accordingly.

The rate order was accompanied by a lengthy opinion which makes it clear that the ·Commission assumed the continuance of the 1931 contract and based its order, which was to operate prospectively, upon the relationship created by that instrument as it construed it.

For example: (a) The Commission's jurisdictional findings as to the use of Penn Water's facilities for the transmission of electric energy at wholesale in interstate commerce were 'based upon the assumption that the method of operation required ·by the contract of 1931 would continue. (b) The allocation of cost of service which the Commission made was premised upon its interpretation of Consolidated's entitlements and Penn Water's obligations under the 1931 contract. (c) The rate of return which the Commission allowed Penn Water was largely 'based upon the financial security which the Commission thought Penn Water enjoyed under the 1931 contract. Moreover, the form of rate schedule later prescribed followed the residual-entitlement, specified-return formula of the 1931 contract.

Having observed the patent fact that the rate reduction order was based upon, and applied only to, the combination of facilities and interchange of energy set up by the 1931 contract, Penn Water applied to the Power ·Commission on January 28, 1949, for a rehearing. It sought to show that the order ought not to be premised upon a contractual relation which it regarded as illegal and which, if judicially found unlawful, could not continue to exist.

Among other things, Penn Water pointed out to the Commission that on December 20, 1948, after the record in the Commission's proceeding ·had been closed, it ·had terminated the 1931 ·contract 'by notice to Consolidated; and that it had sued Consolidated in the United States District Court for the District of Maryland for a declaration that the contract was invalid and unenforceable.[2] Apparently this was

---

2. In the course of its application for rehearing, Penn Water stated to the Commission:

"(c) Since the record in the proceeding has been closed the purported contract referred to as supplemented, has been terminated by notice dated December 20, 1948; and if given the opportunity on rehearing Petitioners hereby offer to prove:

"(i) The fact of such termination;

"(ii) The contract was null, void, and unenforceable because the basic agreements were made at a time when Penn Water and Baltimore Company [Consolidated] were affiliated through substantial ownership by Baltimore Company of Penn Water stock and by interlocking directors and officers; the basic agree- · ments were never approved or ratified by the stockholders of Penn Water; the effect of Articles IV and V of the supplemental agreement of June 1, 1931, particularly as construed in practice by Baltimore Company, made the contract *ultra vires* and contrary to public policy; and such supplemental agreement constituted an agreement in unreasonable restraint of trade and in unreasonable restriction of competition in the generation and sale of electrical services, and unreasonably limited the output of electrical energy contrary to the laws of the United States, including Section 1 of the Sherman Antitrust Act of July 2, 1890 (15 U.S.C.1946 ed. § 1; 26 Stat. 209, 50 Stat. 693), Section 5 of the Federal Trade Commission Act of September 26, 1914 (15

the first time the Federal Power Commission had been officially informed that Penn Water had given notice of termination of what the Commission calls the "system foundation contracts," and that Penn Water considered them violative of the anti-trust laws and the utility laws of Pennsylvania and had sued for a declaration to that effect.

On February 26, 1949, the Power Commission denied the application for rehearing and filed an opinion in response to it, in the course of which it said:

"* * * If there are questions as to the legality of the foundation contracts which are in litigation, as Respondents' application for rehearing indicates, the validity of our order is not dependent upon the decision of those questions. In our opinion and order *we took care to leave the continuation of the operation of the integrated and interconnected system* [3] *in full effect, merely changing the rates,* as shown by our statement wherein we specifically stipulated that

" 'The present arrangement whereby sales to Pennsylvania customers are made on a firm basis on definite rate schedules whereas Baltimore Company takes what is left and assures Respondents of the recovery of all proper operating expenses, depreciation, taxes and a fair return, is the most practicable under the circumstances. *That arrangement will, therefore, be continued* with, however, such modifications as are necessary to accomplish the reductions mentioned above to Pennsylvania Power & Light, Philadelphia Company, Metropolitan Company and Baltimore Company.' " (My emphasis.)

Later in 1949—on October 27—the Commission prescribed a rate schedule for Penn Water's service to Consolidated which was designed to effectuate the reduction in Penn Water's revenue which it had ordered on

January 5. The last paragraph of the October order is as follows: "The foregoing provisions supersede only the rates and charges heretofore made, demanded, collected or assessed against Baltimore Company by Penn Water and Transmission Company. All other provisions of the aforementioned contracts, in and of themselves lawful prescribing or defining the power, energy and transmission services to be furnished, or any classification, practice, regulation or rule affecting such services, which several provisions are incorporated herein by reference, shall be observed and be in force."

The revenue reduction order of January 5, 1949, and the rate order of October 27, 1949, are those which this court was asked to review.

II.

While the proceeding before the Power Commission, which has just been described, was in progress, the litigation in the Fourth Circuit began. As of June 1, 1931, Penn Water and Consolidated, which were then under common dominance, had drastically amended a previously existing contract between them so as to form a combination of their utility facilities under terms which made Penn Water a virtual vassal of Consolidated. Fifteen years later the two corporations ceased to be under common control and thereafter each was managed independently. But the basic contract of 1931, burdensome and restrictive as to the Pennsylvania company, not only continued to define and govern the relationship between the two utilities, but by its terms was to endure until 1980,—a bleak prospect indeed for Penn Water.

Due to differences and disputes which developed, Consolidated invoked the arbitration provisions of the contract on September 1, 1948. Shortly thereafter, Penn Water instituted suit in the United States

---

U.S.C.1946 ed. § 45; 38 Stat. 719), and Section 10(h) of the Federal Power Act (16 U.S.C.1946 ed. § 803(h), 41 Stat. 1068, 49 Stat. 842), and to the laws of Maryland and Pennsylvania.

"(iii) Baltimore Company committed material breaches of the contract which justified its termination; and

"(iv) The foregoing matters are now in litigation between Penn Water and Balti-

more Company on complaint of Penn Water for declaratory and other relief, before the United States District Court for the District of Maryland, Civil Action No. 4179."

3. This refers, of course, to the two sets of facilities as operated under the contract.

District Court at Baltimore, asking that the arbitration provisions be declared unenforceable and that Consolidated be enjoined from proceeding thereunder. It gave notice of termination to Consolidated and in an amended complaint asked that the 1931 agreement be struck down in its entirety.

Thereupon Consolidated applied to the District Court for a restraining order and on February 9, 1949, the court restrained Penn Water, pending final determination of the issues, from doing anything in respect to the generation, transmission and disposition of power covered by the 1931 agreement in any manner different from the procedure theretofore followed in the performance of the contract. The District Court filed an opinion[4] on February 29, 1950, declaring the 1931 contract valid, and directing arbitration to proceed.

Penn Water appealed to the United States Court of Appeals for the Fourth Circuit and that court, on September 30, 1950, handed down an exhaustive opinion[5] reversing the judgment of the District Court. The appellate court held the 1931 contract invalid as contrary to public policy and as violative of the Sherman and Clayton Acts and the public utility laws of Pennsylvania. In the course of the opinion, the Fourth Circuit said, 184 F.2d at page 568: "* * * It may well be, although the *present arrangement* between the Maryland and Pennsylvania utilities is invalid for the reasons set forth, that an interconnection of facilities and an interchange of electrical energy between them may be continued by some method that would meet with the approval of the appropriate regulatory authority and will not offend either the antitrust laws or the utility laws of Pennsylvania." (Emphasis supplied.)

Consolidated's petition for *certiorari* was denied by the Supreme Court on December 11, 1950,[6] as a result of which the case went

back to the District Court for entry of a declaratory judgment in accordance with the opinion of the Court of Appeals for the Fourth Circuit. After the remand, a controversy arose in the District Court as to whether the invalidation of the 1931 agreement had revived an agreement of 1927 between the parties for the interstate sale and delivery of electric energy so that Consolidated was entitled to continued deliveries by Penn Water, in accordance with the terms set forth therein, regardless of the invalidity of the amendatory contract of 1931. In response to a motion by Penn Water that the Fourth Circuit interpret its mandate and settle the controversy, that court delivered a second opinion on January 10, 1951.[7]

The court held the earlier agreement of 1927 was not revived when the amendatory contract of 1931 was declared illegal, and reiterated in unmistakable terms its former holding that the 1931 contract was invalid in its entirety. In the course of the opinion, the Fourth Circuit said, 186 F.2d at 937, that by entering into the amendatory contract

"* * * Penn Water gave up its independent status as a producer and seller of electric energy and subjected itself so completely to the dominance of Consolidated as to violate the controlling statutes and *hence the 1931 agreement must be stricken down.*

"* * * Here the prior contract has been merged in and its nature changed by the subsequent unlawful agreement, and as so changed, it has resulted in *an unlawful relationship which has continued for twenty years.* When the illegality of such relationship is declared, it is idle to contend that the court can withdraw the original contract from the illegal relationship and give validity, certainly after it has been buried therein for so long a period. *It must perish along with the relationship*

4. Pennsylvania Water & Power Co. v. Consolidated Gas Electric Light & Power Co., D.C.Md., 89 F.Supp. 452.

5. Pennsylvania Water & Power Co. v. Consolidated Gas, Electric Light & Power Co., 4 Cir., 184 F.2d 552.

6. Consolidated Gas Electric Light & Power Co. v. Pennsylvania Water & Power

Co. and Hessey et al., constituting the Public Service Commission of Maryland v. Pennsylvania Water & Power Co. (two cases), 340 U.S. 906, 71 S.Ct. 282.

7. Pennsylvania Water & Power Co. v. Consolidated Gas, Electric Light & Power Co., 4 Cir., 186 F.2d 934.

of which it has been made an inseparable part.

\* \* \* \* \* \*

"Throughout the trial of this case and in the argument of the pending motion, Penn Water has reiterated its desire to continue to supply electric energy to Consolidated; and in view of the close relationship between the parties, the existence of interconnecting equipment and the control over its rates by the regulatory bodies, there is no reason to fear that the interests of consumers of electricity in Maryland will suffer through *the invalidation of the existing contract* between the two utilities.

"The District Court should issue a declaratory judgment (1) setting aside its judgment and order of March 18, 1950; (2) *declaring that the agreements of December 31, 1927, June 1, 1931 and September 29, 1939 are void and of no effect;* and (3) dissolving the restraining order of February 9, 1949." (Emphasis supplied.)

Presumably the District Court at Baltimore then entered a judgment declaring the agreements between Penn Water and Consolidated to be void and of no effect, as it had been directed to do. There was no equivocation or limitation in the Fourth Circuit's directive. It did not simply hold void the restrictive provisions, but condemned the 1931 agreement in its entirety. This was obviously because the court considered that the whole arrangement depended upon the restrictions which fettered Penn Water and that the paragraphs containing the restrictions, therefore, were not severable from the remainder of the contract. This appears from the following excerpt from the Fourth Circuit's opinion, 186 F.2d at 936: "The 1931 agreement, on the other hand, provided that Consolidated should be entitled to all the electric capacity and energy available to Penn Water and not otherwise disposed of in the performance of existing contracts, and in consideration thereof, Consolidated agreed to pay Penn Water an amount equal to its operating expenses, a specified rate of return on existing facilities, and on the cost of new facilities less depreciation, and Consolidated was allowed a credit for the amount of the sales of energy by Penn Water to other persons.

Closely associated with these provisions were the illegal restrictions on the future activities of Penn Water which resulted in the invalidation of the whole contract. Therein Penn Water was required to obtain the approval of Consolidated before entering into any agreement for the sale or purchase of electric power and energy and to obtain the approval of Consolidated before making any investment or disposing of its property having a value in excess of $50,000. These restrictive conditions were included in order to safeguard Consolidated in the performance of its promises and it is conceded that without them the contract would have been impracticable and would not have been made."

Although a final judgment of a court of competent jurisdiction had thus invalidated the entire contract between Penn Water and Consolidated, the Federal Power Commission still regarded it as desirable and in the public interest that the facilities of the two companies be operated as one integrated and interconnected system. Being of that opinion, the Commission was understandably anxious that the co-operative use of facilities and interchange of energy be continued. I think it should have called the parties in and required them to work out immediately a new contract in conventional form which would accord with the opinions of the Court of Appeals for the Fourth Circuit. The Commission thought, however, that the Fourth Circuit meant only to condemn the two paragraphs of the 1931 agreement which prohibited Penn Water from selling or buying energy and from increasing or reducing its plant investment without Consolidated's consent. It reasoned that it could require the continuance of the old contract if those paragraphs were eliminated. This would leave in effect the contractual definition of Consolidated's residual entitlements and the residual payment type of rate. But the Fourth Circuit said those provisions were so closely associated with the illegal restrictions on the future activities of Penn Water that the whole contract was invalid. The court's opinions make abundantly clear its intention to strike

down the entire arrangement,—not just the restrictive provisions.

It is significant that Penn Water and Consolidated conceded that, without the unlawful restraints on the former, the 1931 contract would have been impracticable and would not have been made. That was an admission that the restrictions and the remainder of the contract were so "closely associated" that illegality of the restrictions resulted in complete invalidity. Even if the unlawful paragraphs of the agreement were severable, the remaining provisions would be incompatible with the Fourth Circuit's decision because under them free and unrestrained competition would still be impossible. Welding the facilities of the two companies into one integrated system—the Commission's objective—is not conducive to competition.

### III

After the "system foundation contracts" had been held null and void, Penn Water entered a motion in this court on December 29, 1950, asking that we " * * * set aside, annul and dismiss the orders of the Commission sought to be reviewed in these proceedings, or, in the alternative, remand these proceedings to the Commission with instructions to annul and set aside its orders herein sought to be reviewed * * *."

The Pennsylvania Public Utility Commission also moved this court on December 29, 1950, "To annul and dismiss the orders of the Federal Power Commission sought to be reviewed in Case No. 10,239 on the ground that the decision of the United States Court of Appeals for the Fourth Circuit in Pennsylvania Water & Power Company and Pennsylvania Public Utility Commission v. Consolidated Gas Electric Light and Power Company of Baltimore and Public Service Commission of Maryland, 184 F.2d 552 (1950), cert. denied December 11, 1950, renders invalid, null, void and of no effect the orders of the Federal Power Commission and the proceedings before it pursuant to which said orders were issued."

The question presented by these motions was what I have called the basic issue: can the Federal Power Commission lawfully establish between Penn Water and Consolidated a relationship which constituted a violation of the anti-trust statutes when established by contract between them? One who considers that question should bear in mind three indisputable propositions: 1. Regulated industries are not *per se* exempt from the Sherman Act. 2. Part II of the Power Act does not give the Commission power to lift the ban of the anti-trust laws. 3. As repeals by implication are not favored, only a clear repugnancy between the old law and the new results in the former giving way and then only *pro tanto* to the extent of the repugnancy. Georgia v. Pennsylvania Railroad Company, 1945, 324 U.S. 439, 456–457, 65 S.Ct. 716, 89 L.Ed. 1051; United States v. Borden Company, 1939, 308 U.S. 188, 198 et seq., 60 S.Ct. 182, 84 L.Ed. 181.

In denying the motions and holding that the Commission has such power, the majority of the court necessarily first concluded that Part II of the Federal Power Act had impliedly repealed or superseded the anti-trust statutes so as to exempt from their prohibitions the combination between Penn Water and Consolidated which the Commission ordered to continue.

In order to show in bold relief the thinking of my brothers of the majority which led them to that conclusion, I have skeletonized the pertinent portion of their opinion:

"The problem raised by the motions is one of the interrelation of two statutory schemes—each of which reflects different historical pressures and different conceptions of the public interest. The Sherman Act, 15 U.S.C.A. §§ 1–7, 15 note, and related laws represent an attempt to keep the channels of competition free so that prices and services are determined by the workings of a free market. * * * In marked contrast is a statute such as Part II of the Federal Power Act. It evidences congressional recognition that competition can assure protection of the public interest only in an industrial setting which is conducive to a free market and can have no place in industries which are monopolies because of public grant * * *.

"These contrasting objectives indicate that the antitrust laws can have only limited

application to industries regulated by specific statutes. * * *

"* * * The net effect of what we have already said is that, though regulated industries are not *per se* exempt from the antitrust laws and repeals by implication are not favored, the antitrust laws are superseded by more specific regulatory statutes *to the extent* of the repugnancy between them. * * * where a statute provides for comprehensive and detailed regulation of a particular industry, as do the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., and the Federal Power Act, there is, as we have indicated, only a limited area for application of antitrust considerations to Commission decisions."

These generalities boil down to the thesis that Part II of the Federal Power Act is repugnant to the anti-trust laws and therefor supersedes them to the extent of the repugnancy; and that the repugnancy extends so far as to exempt from the anti-trust laws the combination of utilities ordered by the Commission which is otherwise clearly illegal under those statutes. The majority do not point out with particularity the repugnancy upon which they rely. They seem to find it in the "contrasting objectives" of the anti-trust acts and Part II of the Power Act, saying the first was designed to obtain the benefit of free competition, and the other to eliminate competition as having no place in the utility field and to substitute for it a regulatory agency. This being the only repugnancy suggested by the majority, their holding necessarily is that the anti-trust laws are superseded by Part II of the Power Act to the extent that the *objectives* of the two forms of legislation are in contrast. Let us see if there is really any repugnancy between the Sherman Act and Part II of the Power Act.

The first section of the former, which is 15 U.S.C. § 1, declares illegal every contract, combination or conspiracy in restraint of trade or commerce. The 1931 contract between Penn Water and Consolidated was held violative of that section.

Section 202, found in Part II of the Power Act, empowers the Commission to require the interconnection and co-ordina-tion of the facilities of the two utilities. But neither that section nor any other section of Part II authorizes the Commission to require interconnection and co-ordination of facilities under terms and conditions which will result in a violation of the Sherman Act. The Commission can exercise its power under § 202 and under all of Part II without setting up an arrangement which is unlawful under anti-trust statutes. The Fourth Circuit intimated as much when it suggested that the interconnection of facilities and interchange of energy be continued "by some method that would meet with the approval of the appropriate regulatory authority and will not offend either the anti-trust laws or the utility laws of Pennsylvania." [184 F.2d 568.] The majority opinion does not suggest any reason why that cannot be done by the Commission.

Since the Power Commission can perform all its functions under Part II without creating a violation of the Sherman Act, there is no repugnancy between the two statutes, and no room for the court to say that Part II superseded the anti-trust statutes.

I have said, as did the Fourth Circuit, that neither Part I nor Part II of the Federal Power Act purports to suspend the anti-trust statutes with respect to licensees and utilities regulated thereunder. On the contrary, § 1 of the Sherman Act is substantially repeated in § 10(h), found in Part I of the Power Act, 16 U.S.C. § 803(h), which is as follows: "Combinations, agreements, arrangements, or understandings, express or implied, to limit the output of electrical energy, to restrain trade, or to fix, maintain, or increase prices for electrical energy or service are hereby prohibited."

Penn Water is a licensee under Part I of the Act and so is subject to the prohibitions of § 10(h). The majority considers that the omission of that section from Part II not only repealed § 10(h) but also amounted to a repeal of the prohibitions of the Sherman Act as far as regulated companies are concerned. That amounts to saying that the anti-trust laws do not apply to any regulated industry unless their provisions

are substantially repeated in the regulatory statute. Just the opposite is true: the anti-trust laws apply to regulated industries unless exemption therefrom is expressly provided in the regulatory statute, or must inevitably be implied from provisions of the regulatory act which are clearly repugnant to anti-trust prohibitions.

It must be noted, too, that Penn Water does not lose its status as a licensee under Part I simply because it is regulated also under Part II. It continues, nevertheless, to be a licensee and so continues to be for-bidden by § 10(h) to engage in the com-binations or arrangements made illegal thereby. It follows that, when the Com-mission required Penn Water and Con-solidated to remain in the combination which had been condemned by the courts, it not only did not act under the authority of Part II which gives it no such power, but also affirmatively violated § 10(h) of its own basic act.

The majority opinion says, however, that when a Part I licensee is also a Part II company, as Penn Water is, it is no longer subject to the anti-trust provisions of § 10(h), simply because the language of that section does not appear in Part II. Then the notion that § 10(h) was repealed by Part II is thus stated in the opinion: "* * * The prohibitions of § 10(h) would apply to a licensee which is also regulated under Part II only to the extent that the prior statute is not repealed by the clear repugnancy between it and the later statute."

I suppose the court meant to say that Part II is clearly repugnant to § 10(h) because it does not contain similar language and therefore repealed that section by im-plication. But Part II is not repugnant to § 10(h) for the same reasons that it is not repugnant to the anti-trust laws: it is not necessary for the Commission to cause a violation of § 10(h) in order fully to ex-ercise its regulatory power under Part II over a Part I licensee which is subject to Part II regulation.

One other phase of the portion of the court's opinion which denies the motions remains to be noticed. It is that in which the court purports to give another reason for denying the motions to annul, in ad-dition to the fallacious theory that the anti-trust laws do not apply to regulated in-dustries. On examination, however, the additional ground is seen to rest upon the same erroneous idea. It is thus stated in the opinion: "To grant petitioners' motions and set aside the order at this time would be to substitute antitrust criteria for those of the Federal Power Act, * * .*."

By this the court meant that it would be improper to annul the Commission's orders on the mere ground that "a decision handed down in a suit between private parties un-der a non-controlling statute" had destroyed the only arrangement to which they could possibly have application. If Penn Water "wishes," because of the Fourth Circuit's decision, to make some change in the old contractual arrangement which the Com-mission has ordered to be retained, the ma-jority say the only thing it can do is to sub-mit its proposed new arrangement. Then, after the Commission has disposed of the proposal, Penn Water can file a new peti-tion for review if it feels aggrieved. That would be true if Penn Water wanted to change an existing *legal* arrangement.

The key error in the court's reasoning is revealed by its allusion to the decision of the Fourth Circuit as one "handed down in a suit between private parties under a non-controlling statute." It shows that in assigning this additional reason for deny-ing the motions to annul, the court is still assuming that the Commission can lawfully require these utilities to form a combination which they cannot legally form by their own contract.

I think I have shown sufficiently already that the Sherman Act *is* the controlling statute which the Commission is not em-powered to override. That the judgment invalidating the existing arrangement was handed down in a suit between private parties is, of course, immaterial. It is binding on those private parties, yet this court has required them to disobey it. It has done so upon the erroneous idea that the Sherman Act has been superseded by Part II of the Federal Power Act and so is not the "controlling statute."

In the portion of the majority opinion now being discussed, the court says it is the existing "services and rates, reflecting underlying operations, which were the subject of the Commission's order." The implication is that all the Commission has done is to prescribe rates for service actually being rendered; that if the rates are just and reasonable for that service, and if the Commission's findings in that respect are supported by substantial evidence, "our review is at an end." I suggest that the "underlying operations" were the subject of the Commission's orders and therein lies the vice in them. They did not deal with rates alone but ordered the contractual "underlying operations" to continue.

It is a boot-strap argument to say that, because the Commission has power to prescribe rates for existing service so long as it is being rendered, it can therefore require continued rendition of the service no matter if it is unlawful.

For the reasons given, I think the motions to annul the Commission's order should have been granted, and so I dissent. My brothers of the majority, having denied the motions, then proceeded to explore the merits of the rate reduction order and the implementing rate schedule which the Commission prescribed, and affirmed those orders. I dissent also from that action, as I think the orders should have been set aside as improper. But I do not prolong this dissent by discussing the merits of the orders, as I think it perfectly clear that they should have been set aside as being without basis or applicability after the Fourth Circuit's judgment became final.